[Nos. 62438-1; 62440-2; 62441-1; 62442-9; 62443-7; 62643-0.  En Banc.]
Argued May 24, 1995.      Decided May 9, 1996.

THE STATE OF WASHINGTON, *Respondent*, v. ERIC L. CLARK, *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. DIONTE MIGUEL POUGUE, *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. D.J.W., ET AL., *Petitioners*.

THE STATE OF WASHINGTON, *Respondent*, v. MALIK SALEEM, *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT F. HARDY, *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. JERRY JOHNSON, *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. SELESTINE JENKINS, *Petitioner*.

212

214

*Ende, Subin & Philip*, by *Neal J. Philip*; and *Nielsen & Acosta*, by *Eric J. Nielsen*, for petitioners.

*Norm Maleng, Prosecuting Attorney*, and *James M. Whisman* and *Rian K. Ebesugawa, Deputies*, for respondent.

TALMADGE, J. — Often in a bazaar–like setting on the street, the defendants responded to a police informant's request for rock cocaine by approaching or entering the informant's car, and selling or delivering rock cocaine to the informant. A camera recorded them in the act. They contend the audio recordings[1] were inadmissible because their conversations with the informant were private under the Privacy Act, RCW 9.73.030, and the authorization to record under RCW 9.73.090(5) was not based on probable cause because the authorities had no particular suspect in mind other than street traffickers dealing drugs. In sixteen cases, the trial courts admitted the recordings of the conversations into evidence. The Court of Appeals held that conversations of "vendors . . . selling their wares on a public street to anyone" are generally not protected by the Privacy Act, and ruled that the orders authorizing the recordings satisfied a statutory standard of probable cause under RCW 9.73.090(5). It affirmed the defendants' convic-

---

[1]This case pertains to the admissibility of the *audio* recordings only. RCW 9.73 bans only audio recordings of private conversation, not photographs or soundless video recordings of persons' images. *Haymond v. Department of Licensing*, 73 Wn. App. 758, 761, 872 P.2d 61 (1994); *State v. Raymer*, 61 Wn. App. 516, 519, 810 P.2d 1383, *review denied*, 117 Wn.2d 1022, 818 P.2d 1098 (1991).

tions for delivery of controlled substances. *State v. D.J.W.,* 76 Wn. App. 135, 882 P.2d 1199 (1994).

We find the conversations here were not private because they were routine sales conversations on public streets between the defendants and a stranger who happened to be an undercover police informant. Twelve of the sixteen conversations also took place in front of a third party, or while the defendant was standing in the public thoroughfare within sight and hearing of any passerby. Because the conversations were not private, RCW 9.73 does not apply and the defendants' convictions are affirmed.

### Issues

1. Does a surreptitious recording of a conversation between two or more persons, with the consent of one party, violate the Fourth Amendment or Article I, Section 7 of the Washington Constitution?

2. For purposes of RCW 9.73, is a conversation "private" where it is brief, takes place between strangers on a public street, sometimes in front of third persons, and concerns the terms of a routine illegal drug transaction?

### Facts

The Seattle Police Department (SPD) and the Federal Bureau of Investigation (FBI) hired Kevin Glass as an informant. At the time of the trials, Glass was 26 years old and had some 18 years' experience in armed crime, gang culture, and street–level dealing in illegal drugs.[2] After serving time in adult prison, Glass secretly began to work for law enforcement in San Diego, California, while outwardly posing as a loyal "Crips" gang member. He

---

[2]By the age of eight, Glass used drugs and joined the "Crips" gang in San Diego, California. By his early teens, he participated in armed robberies, drug sales and drive-by shootings. After serving some time in a youth facility, he rejoined the gang, smoked and sold rock cocaine, and advised his peers on methods of burglary and robbery.

provided information to the police concerning numerous serious crimes, including drug and weapons transactions. Glass then went to Riverside, California, to pose as a typical street–level cocaine buyer in a car with a hidden camera. He made 45 purchases in Riverside; the authorities convicted all 33 suspects they located.

In late 1991, the FBI asked Glass to perform a similar operation, termed "Operation Hardfall," in Seattle. The SPD and FBI jointly undertook Operation Hardfall to address drug trafficking in high crime areas of Seattle. Commander William Bryant, head of the SPD Narcotics Section, applied to the King County Superior Court for authorization pursuant to RCW 9.73.090(5) to record conversations between Glass and prospective drug dealers. He averred in the application for recording authorization that there was probable cause to believe that street traffickers dealing drugs in high drug trafficking areas would have conversations evidencing violations of the Uniform Controlled Substances Act, RCW 69.50. The determination of high drug trafficking areas was based upon community complaints; the areas encompassed a large portion of the City of Seattle.[3] Bryant stated that the typical drug conversation between a street seller and buyer would be very short and would concern quantity, quality and selling price of the drugs. He noted a seller usually could detect a police officer or informant, and the Riverside operation apparently succeeded due to Glass' expertise in posing as a typical customer. He stated that the recording was needed to help identify suspects, corroborate the testimony of the cooperating witness, and disprove any al-

---

[3]The areas included "Stay Out of Drug Areas" (SODAs) used by King County Superior Court judges in pretrial release and sentencing orders, and areas designated by police specifically for Operation Hardfall. See RCW 10.66.020 ("off–limits" orders to keep traffickers out of known illegal drug sales areas). In downtown Seattle, one area was bounded by Elliott Avenue, Wall Street, 4th Avenue and Union Street. Another area encompassed most of the Pioneer Square and International Districts. A third encompassed everything between Denny Way, Queen Anne Avenue North, Mercer Street and Dexter Avenue North. In the East Precinct, 11 SODAs cut a broad swath. One SODA near Garfield High School contained approximately 45 blocks and was contiguous to four other SODAs. There were other areas in West Seattle and North Seattle as well.

leged entrapment. The application sought the authorization for a two–week period, and disclosed that several renewals were contemplated, after which officers would try to arrest all suspects.

The trial court granted the application, finding (a) probable cause that street traffickers were dealing drugs in high drug trafficking areas of Seattle and unincorporated King County in violation of RCW 69.50; (b) probable cause that communications or conversations relating to such offenses would take place and would be evidence of the crimes; (c) Glass consented to the recording; and (d) normal investigative techniques would be unlikely to succeed if tried. The trial court authorized recording for a two–week period and subsequently extended the authorization for additional two–week periods through March 1992.

In practice, detectives chose a specific location for Glass to visit each day within the court–defined areas. Detectives would search Glass, give him money, and tell him where to go. A camera in Glass' car recorded those who approached the front passenger window or sat in the front passenger seat. The detectives stayed in another car as near as possible, trying to avoid being spotted. On the street, Glass typically honked his horn or called out, "What's up? You soupin'?" This expression meant, "Are you selling rock cocaine?" He testified that typically:

> I would make contact, ask them are they soupin' [i.e.] are they sellin' rock cocaine. And then they would return, and tell me what do I want, and then I would tell them what I wanted, $40 worth, $20 worth, they would give it to me, I'd hand them the money.

Clark Report of Proceedings at 315.[4] An FBI agent corroborated the brevity of the typical street–level illegal drug sale encounter: "One person makes it clear that they want to buy. The other person makes it clear they have

---

[4]References to reports of proceedings or exhibits in each case are identified by the defendants' names.

the product. Quick exchange between money and narcotics, and then both just disperse there."[5]

When Glass honked or called out to a group, often several individuals would step forward to compete for the first chance to sell drugs to Glass.[6] Glass even had to develop a special system for tracking rocks of cocaine he bought from multiple sellers. Sometimes he had to instruct the vendors to stand in line.[7]

After each purchase, Glass called the police and described the seller. Detectives then drove through the neighborhood to identify the suspect. Upon returning to the safe house, the police retrieved the bagged, marked cocaine, and searched and debriefed Glass.

The brief conversations that each defendant had with Glass concerned a routine illegal drug transaction. Each conversation was initiated while the defendant stood on a

---

[5]Jenkins Report of Proceedings at 190; *see also* Clark Report of Proceedings at 242; Pougue Report of Proceedings, July 29-30, 1992, at 141.

[6]Glass' encounter with defendant D.J.W. was typical of this competition. When Glass honked his horn, D.J.W. and another person said, "Me, me." D.J.W. shoved the other person aside and entered the car. D.J.W. relented, and let the other person in the car, after Glass promised to purchase from both of them. The parties drove a short distance, while Glass negotiated prices and made purchases from both persons. When D.J.W. exited a few minutes later, Glass leaned over and asked him his name. Standing on the sidewalk, D.J.W. told Glass his name, and then re–entered the car and wrote his phone number on the windshield. He promised to deliver "soup" to Glass within fifteen minutes anytime Glass paged him on a "911" basis. D.J.W. Exhibit 1.

[7]Glass testified:

If I drive into the corner and there is five individuals and I ask who's soupin', if four of them are around the car, I tell them to stand in line, I mean literally stand in line. While one person comes up and leans through the window and gives me two rocks for a 40 [i.e., $40], I put that in my left hand. I say, "Wait a minute." By the time the next person is getting in, I am putting the dope [from the first seller] either in my left front pocket, or left cup holder. Number two gets in, and I ask him what did he have, 40, 30, 20, whatever. I buy that, and that goes in my right front pocket, or right cup holder.

Jenkins Report of Proceedings, October 23, 1992, at 354-55. Glass had an even more refined method to keep track if there were more than two sellers at a time: ". . . if I am making more than two or three buys at one particular time, and I know I am, [the first two would go] into my pockets, and then if I am making the third buy, it would have went in the left cup holder, and the fourth buy went into the right cup holder." *Id.* at 355.

public street, sidewalk or in a parking lot. Glass did not know any of the persons who approached or entered his car. The conversations often occurred in front of other people.

For example, Glass spoke with defendant Clark in front of several other persons. Glass drove up to four men standing in the parking lot of an L–shaped apartment building with open walkways overlooking the lot. Glass said, "What's up, you soupin', man?" Three men approached; Clark arrived first and got in the passenger seat. The other two men stood by, leaning forward at the window. Glass asked for a "double"; Clark showed him cocaine, and said, "I'll give you all that for what you got right now." Glass said, "No." Clark said, "This is like, $160." Glass said, "No." One of the other men said, "A blue van," indicating a law enforcement vehicle. Clark and the others looked behind Glass' car briefly. After a moment, Glass and Clark made an exchange, and Clark got out of the car. In front of the others, Clark turned around and yelled back to Glass, "Hey, come back, all night." This conversation lasted one minute. Clark Ex. 3.[8]

Another typical conversation of this sort where others were present was the two–minute talk Glass had with defendant A.G.E. Glass drove by four persons including A.G.E. and said to the group, "You soupin'?" One person got in the car. Glass yelled to the others, "Y'all got some?" One of them said, "Scooter got some." The one in the car gave Glass something. Glass complained that it was too small, and yelled to the others. The one in the car got out and A.G.E. got in. Glass asked for a "forty." A.G.E. looked around, got something out and handed it to Glass in exchange for the money. A.G.E. said, "I really needed that. Now I can go home." After further small talk, A.G.E. said he was "Scooter," and asked Glass to "Come back through." Glass said, "I will." A.G.E. Ex. 4.

---

[8]The quotations and descriptions of conversations with particular defendants are based upon the videotapes admitted in each case and are referenced by exhibit number.

Glass' conversation with T.L.C. was typical of four conversations in which a defendant entered the car alone with Glass. The brief conversations completed negotiations which started on the street. Glass asked one seller if anyone else in a group of persons had drugs. The seller got out of the car, went over to T.L.C., and asked him if he had any "soup." T.L.C. then approached Glass' car. Glass asked if he was "souping," and he said "Yeah," and got in. While Glass circled the block, they made an exchange and spoke about the quantity, T.L.C.'s supplier, and the price of cocaine. They made arrangements for T.L.C. to call Glass the next day to make another sale. The conversation took ninety seconds. T.L.C. Ex. 4.

All 16 conversations were essentially like the ones described above — brief conversations on the street between Glass and a stranger about the terms of the routine illegal drug transaction.

The active phase of Operation Hardfall took place from January 21 to March 27, 1992. Arrests started on April 13, 1992. Ultimately Glass made 139 purchases, which resulted in 96 cases filed in superior court.

The 16 defendants here were each charged with delivery of controlled substances, and each lost a motion in the trial court to suppress the secret recordings. The Commissioner of the Court of Appeals, Division One, consolidated 10 cases which involved only the admissibility of the recordings under *State v. D.J.W.*, No. 31088-7. The Commissioner administratively linked six other cases (involving admissibility and other issues) to *State v. D.J.W.* In the consolidated cases, the Court of Appeals affirmed the admissibility of the recordings, and the convictions. *State v. D.J.W.*, 76 Wn. App. 135, 141, 882 P.2d 1199 (1994). In the linked cases, the Court of Appeals also affirmed the admissibility of the recordings, by separate opinions, citing the decision in *State v. D.J.W.* as dispositive. *E.g., State v. Clark*, 76 Wn. App. 150, 883 P.2d 333 (1994). This court

consolidated all of the Operation Hardfall cases under *State v. Clark*, No. 62438-1.

## Analysis

### A. Constitutional Privacy Guaranties

■ The defendants challenge the admissibility of the Operation Hardfall recordings under both the Fourth Amendment of the U.S. Constitution, and Article I, Section 7 of the State Constitution.[9] This court has clearly established that where one participant in a conversation has consented to the recording of the conversation, the recording does not violate Article I, Section 7 of the State Constitution. *State v. Corliss*, 123 Wn.2d 656, 663-64, 870 P.2d 317 (1994). Indeed, in *State v. Salinas*, 119 Wn.2d 192, 197, 829 P.2d 1068 (1992), where a "wired" undercover informant posed as an illegal narcotics seller and secretly recorded conversations with the defendant–buyer, we observed that this constitutional issue was settled, and stated that there is no expectation of privacy under our State Constitution where one party consents to the conversation being recorded.

Similarly, recording a conversation with one party's consent does not violate the Fourth Amendment to the United States Constitution. *United States v. Caceres*, 440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979). The United States Supreme Court has held that a person offering a bribe takes the risk that the offer would be reproduced in court, "whether by faultless memory or mechanical recording." *Lopez v. United States*, 373 U.S. 427, 439, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963). The Supreme Court reasoned that one who unwittingly speaks to an undercover agent necessarily risks the listener's trustworthiness, and has no justifiable expectation of privacy that the same conversation that could be recounted under oath in a court of law might not also be played back in court on a

---

[9]Article I, Section 7 provides that "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

tape recorder. *United States v. White*, 401 U.S. 745, 751, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971). "[A] defendant who has no constitutional right to exclude the informer's unaided testimony" has no "Fourth Amendment privilege against a more accurate version of the events in question." *White*, 401 U.S. at 753.

It is undisputed that Glass consented to the recordings here. Accordingly, under either the state or federal constitutional privacy guaranties, the defendants had no reasonable expectation of privacy that their buyer would not record their conversations. The state and federal constitutions are not violated, and any privacy protection afforded defendants' conversations with Glass must be found in the Privacy Act.

## B. Routine Street Conversations About Drug Sales Under the Privacy Act

### 1. The Privacy Act

Our state has a long history of statutory protection of private communications and conversations. In 1909, the Legislature first penalized the opening of a sealed letter or divulging the contents of a telegram. RCW 9.73.010, .020. In 1967, the Legislature made it unlawful, with some statutory exceptions, to intercept or record by any device any private conversation or communication transmitted by telephone, telegraph, radio, or other device without the prior consent of all participants or a court order. RCW 9.73.030.[10]

In 1977, the Legislature permitted electronic recording of conversations with one party's consent where law enforcement obtained an order from a judge or magistrate finding probable cause to believe that the nonconsenting party committed, was engaged in, or is about to commit a

---

[10]Violation of RCW 9.73.030 constitutes a gross misdemeanor, RCW 9.73.080, and may also result in civil liability. RCW 9.73.060. Information obtained in violation of RCW 9.73.030 is generally not admissible in criminal proceedings. RCW 9.73.050. *State v. Fjermestad*, 114 Wn.2d 828, 791 P.2d 897 (1990).

felony. RCW 9.73.090(2). Authorizations under this section are effective for a maximum of seven days. RCW 9.73.090(4).

In 1989, the Legislature enacted the Omnibus Alcohol and Controlled Substances Act (Omnibus Drug Act) which broadened the ability of law enforcement officers to record private conversations and communications concerning drug felonies. RCW 9.73.090(5). That statute permits interception or recording for a 14-day period upon a finding by a judge or magistrate there is probable cause to believe that the communication or conversation concerns delivery, sale or other enumerated criminal acts relating to controlled substances. Authorization may be granted even though the true name of the nonconsenting party, or the particular time and place of the conversation, is not known at the time of the request, provided that the authorization describes the nonconsenting party and subject matter of the communication or conversation with reasonable certainty. The authorization remains valid even if there is a change in the time or location of the communication or conversation, or if an additional party not named in the authorization participates in the conversation. RCW 9.73.090(5).[11] RCW 9.73.090(5) was the basis for Operation Hardfall.[12]

---

[11]RCW 9.73.230, also adopted in the Omnibus Drug Act, allows the law enforcement agency to initially authorize a twenty-four-hour intercept, followed by judicial review. The authorization must be based upon probable cause the conversation/communication will involve a drug felony. The agency must specify the identity of the particular person or persons, if known, and other details of the offense, RCW 9.73.230(2)(d), (e). An improper interception or recording under this section may constitute a Class C felony and subject the authorizing agency to liability for exemplary damages of $25,000. RCW 9.73.230(10), (11). RCW 9.73.230 is not at issue in this case, but its enactment along with RCW 9.73.090(5) evidences the legislative intent to expand the ability of law enforcement to record private conversations and communications regarding illegal drug transactions. *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 185, 829 P.2d 1061 (1992).

[12]Because we hold the conversations here were not private, we do not reach the issue of whether the trial court's authorization of Operation Hardfall recordings satisfied the requirements of necessity and probable cause in RCW 9.73.090(5). In particular, we do not consider the defendants' arguments that

### 2. Definition of Private Conversations or Communications

■■■ Under RCW 9.73.030, the protections of the Privacy Act apply only to *private* communications or conversations. *Kadoranian v. Bellingham Police Dep't,* 119 Wn.2d 178, 189, 829 P.2d 1061 (1992). To the extent that the recordings here did not involve private conversations or communications, the trial courts properly admitted the tapes into evidence. The Court of Appeals in *D.J.W.* found the conversations were not private because the petitioners were

> vendors of merchandise selling their wares on a public street to anyone who wished to be a customer. Just as a clerk in a store would be willing to engage in a conversation about a product with any customer who happened by, so did the [defendants] manifest a willingness to engage in a conversation with any prospective buyer.

76 Wn. App. at 141. We agree. A conversation between a person and a stranger on a public street about a routine sale of illegal drugs is not private and is not protected under RCW 9.73.

The Legislature did not define the term "private" in RCW 9.73. Washington appellate courts have addressed that term by analyzing under the circumstances of a particular case whether a given conversation or communication was private. In *Kadoranian,* we determined the "intent or reasonable expectations of the participants as manifested by the facts and circumstances of each case" control as to whether a conversation is private. *Kadoranian,* 119 Wn.2d at 190 (quoting *State v. Forrester,* 21 Wn. App. 855, 861, 587 P.2d 179 (1978), *review denied,* 92 Wn.2d 1006 (1979)).[13] We ruled that the term "private" was to be given its ordinary and usual meaning:

---

probable cause in the Privacy Act equates to probable cause under the Fourth Amendment, or that RCW 9.73.090(5) contemplates an individualized probable cause finding.

[13]In *State v. Corliss,* 123 Wn.2d 656, 661, 870 P.2d 317 (1994), we noted that the Privacy Act is not completely coextensive with constitutional privacy rights;

belonging to one's self . . . secret . . . intended only for the persons involved (a conversation) . . . holding a confidential relationship to something . . . a secret message: a private communication . . . secretly: not open or in public.

*Id.* at 189–90. Whether a particular conversation is private is a question of fact, but where the facts are undisputed and reasonable minds could not differ, the issue may be determined as a matter of law. *Kadoranian*, 119 Wn.2d at 190. In deciding whether a particular conversation is private, we consider the subjective intentions of the parties to a conversation. *State v. Faford*, 128 Wn.2d 476, 910 P.2d 447 (1996) (expectation of privacy in use of cordless phone). But our inquiry does not stop there because any defendant will contend that his or her conversation was intended to be private. We also look to other factors bearing upon the reasonable expectations and intent of the participants.

*Duration and subject matter of the conversation.* In *Kadoranian*, a citizen answered a telephone call from a stranger, told the caller that her father was not home, and then took a message. This very abbreviated conversation was not private because the nature of the information conveyed to the stranger indicated it was not intended or reasonably expected to be kept secret. *Kadoranian*, 119 Wn.2d at 190-91. Similarly, in *State v. Riley*, 121 Wn.2d 22, 33-34, 846 P.2d 1365 (1993), we held that a "line trap" used to obtain the telephone number of an alleged computer hacker did not violate RCW 9.73. The telephone number did not constitute a "private conversation" under the statute. *See also State v. Bonilla*, 23 Wn. App. 869, 873, 598 P.2d 783 (1979) (no reasonable expectation of privacy under the Act in telling police of murder because a reasonable person would expect the conversation to be reported to other police officers).

*Location of Conversation and Presence or Potential Pres-*

otherwise there would have been no need for enactment of the Privacy Act. Constitutional cases concerning a reasonable expectation of privacy, therefore, may be relevant but are not binding in setting the boundaries of the protection provided in the Privacy Act.

*ence of a Third Party.* A person has no reasonable expectation of privacy in a conversation that takes place at a meeting where one who attended could reveal what transpired to others. *State v. Slemmer*, 48 Wn. App. 48, 53, 738 P.2d 281 (1987). Similarly, a conversation on a public thoroughfare in the presence of a third party and within the sight and hearing of passersby is not private. *State v. Flora*, 68 Wn. App. 802, 806, 845 P.2d 1355 (1992). In *Flora*, two citizens recorded two police officers who allegedly were harassing one of the citizens on a public street within sight or hearing of passersby. The notion of privacy entails a matter into which there should not be "prying or intrusion," and that "the thing into which there is intrusion or prying must be, and be entitled to be, private." *Flora*, 68 Wn. App. at 808 (emphasis omitted) (quoting *Jeffers v. City of Seattle*, 23 Wn. App. 301, 315, 597 P.2d 899 (1979)). The officers in Flora had no personal privacy interest in statements made as public officers effectuating an arrest in public. *Id.* at 807. In general, the presence of another person during the conversation means that the matter is not secret or confidential.[14]

The fact that a transaction is conducted with the public has been enough for us to find that such transaction is not private, even when the transaction takes place inside a private home, a location normally afforded maximum privacy protection. *State v. Hastings*, 119 Wn.2d 229, 233, 830 P.2d 658 (1992). A person has no expectation of privacy under the Fourth Amendment in a home where illegal business is openly conducted. *Id.* at 232.

*Role of the Nonconsenting Party and His or Her Relationship to the Consenting Party.* The nonconsenting party's apparent willingness to impart the information to an unidentified stranger evidences the non-private nature

---

[14]Under the law of privileged communications, a spoken conversation between two persons is not confidential if it is made in the presence and hearing of a third party. *State v. Barnhart*, 73 Wn.2d 936, 442 P.2d 959 (1968) (interspousal communication); *Ramsey v. Mading*, 36 Wn.2d 303, 312, 217 P.2d 1041 (1950) (attorney-client communication); *Redding v. Virginia Mason Medical Ctr.*, 75 Wn. App. 424, 428, 878 P.2d 483 (1994).

of the conversation. *Kadoranian*, 119 Wn.2d at 190. In *State v. Goucher*, 124 Wn.2d 778, 784, 881 P.2d 210 (1994), the defendant telephoned his cocaine supplier's house and arranged to buy cocaine from the person who answered the telephone, a police officer conducting a search. We concluded the defendant had no reasonable expectation of privacy because he voluntarily exposed his desire to buy drugs to a stranger and, thus, ran the risk that such stranger might provide others access to the conversation. *Id.* at 786. A communication is not private where anyone may turn out to be the recipient of the information or the recipient may disclose the information. *State v. Wojtyna*, 70 Wn. App. 689, 695-96, 855 P.2d 315 (1993) (transmittal of telephone number to pager device not a private communication because the information would be received by anyone in possession of the pager), *review denied*, 123 Wn.2d 1007, 869 P.2d 1084 (1994). " '[W]hat is voluntarily exposed to the general public' is not considered part of a person's private affairs," *Goucher*, 124 Wn.2d at 784 (quoting *State v. Young*, 123 Wn.2d 173, 182, 867 P.2d 593 (1994)).

While each of these factors is significant in making a factual determination as to whether a conversation is private, the presence or absence of any single factor is not conclusive for the analysis.

### 3. The Conversations Here Were Not Private

Looking in a general way at the 16 conversations in these consolidated cases, the duration and location of the conversations, the presence or absence of third parties, the subject matter of the conversations, and the defendants' relationship to Glass are factors in determining the conversations here were not private. Glass was a complete stranger to the defendants. The defendants' conversations with him were essentially the same conversations that the defendants might have had with a great many other strangers who approached asking for cocaine. In dealing with Glass, the defendants clearly had no concern for who

he was, other than to assure themselves on some occasions that he was not the police. They dealt with him as they would have dealt with anyone else on the street in conducting their business with the public. *Hastings*, 119 Wn.2d at 233. The conversations here were not private because they were routine conversations between strangers on the street concerning routine illegal drug sales.

Defendants emphasize they would not have had the same incriminating conversations with persons they knew to be working for the police. They argue that this means we must conclude their conversations with Glass were private. They contend that one can have a private conversation with large numbers of other people, as long as one class of listeners, such as police, is not intended to hear the conversation. We reject this analysis. One cannot intend or reasonably expect a conversation, the gist of which is repeated with large numbers of strangers, to be private. The relevant time for assessing the defendants' intent and reasonable expectations is at the time of the conversation, not at the time of their arrest and prosecution. When they were talking with Glass, the defendants clearly would have not withheld the same information from any other prospective purchaser. Such routine street-level or retail sales conversations are not private.

Moreover, the conversations often took place in front of other persons, or with other dealers wrestling for business in a marketplace atmosphere. In fact, 10 of the defendants' conversations with Glass took place in front of a third party. We believe that the presence of one or more third parties in these cases, regardless of whether the defendant and third party were in the car, means that the conversations were not private in any ordinary or usual meaning of that word. *See Slemmer*, 48 Wn. App. at 53.

Two other conversations were not in front of third parties, but the defendants stood in a public street during their entire encounter with Glass. They were in plain view and potentially within sight or hearing of anyone who might have passed by. The nature of their interaction

with Glass would have indicated to any resident of a high drug trafficking area what was transpiring. These conversations were not private. *See Flora*, 68 Wn. App. at 806.

The remaining four defendants did not speak in front of a third party or entirely while standing in a public street. However, they initiated their sales conversations with Glass in the street, agreeing to provide him with cocaine, and then moved into the car to carry out the transaction.[15] Although holding a conversation behind closed doors may tend to make it private in the usual case, these four conversations were not usual. They involved conversations between the defendants and a stranger, and merely consummated a deal arranged while defendants were in plain view on a public street. Three of these defendants expressly agreed to sell Glass cocaine, as they respectively stood on the street or in a parking lot. Piggee Ex. 1; T.L.C. Ex. 4; Harris Ex. 2. The fourth, C.R.G., entered the car wordlessly after Glass had asked for cocaine, implicitly agreeing to the transaction while on the public street. C.R.G. Ex. 2.

Even when they moved into the car, the four defendants' interaction with Glass was at least partially visible to passersby. Just as a person has no reasonable expectation of privacy when consuming illegal drugs in front of a picture window, visible to any passerby, *State v. Drumhiller*, 36 Wn. App. 592, 595, 675 P.2d 631, *review denied*, 101 Wn.2d 1012 (1984), these four defendants had no expectation of privacy solely because they consummated their public drug deal in a car:

[A] man's home is, for most purposes, a place where he

---

[15]Glass honked his horn, opened the passenger window, and was talking with another person about purchasing cocaine when C.R.G. walked up, entered the car alone and said "What's up?" C.R.G. Ex. 2. Piggee and Glass motioned to each other that Glass would circle the block; when Glass came back, he said, "What's up, dog . . . You got a 40, man?" Piggee then said, "Yeah," and got in the car. Piggee Ex. 1. T.L.C. was asked by a third party if he had "any soup," approached the car, told Glass he had cocaine for sale, and got in. T.L.C. Ex. 4. Harris was contacted by Glass in a restaurant parking lot; told Glass he had cocaine for sale and asked Glass to wait, saying "I'll be right with you, man"; he then returned, got in without a word, and told Glass to drive. Harris Ex. 2.

expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited.

*Katz v. United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 516, 19 L. Ed. 2d 576 (1967), *quoted in Drumhiller,* 36 Wn. App. at 595. To any passerby in a high drug trafficking area, the activity of the four defendants who initiated an exchange on the street and carried it out in Glass' car was perfectly transparent.

Further, the ordinary person does not reasonably expect privacy in a stranger's car. Privacy is a concept that entails the notion that certain matters should not be the subject of "prying or intrusion." *Flora,* 68 Wn. App. at 808. To record a conversation behind a closed door usually would entail prying or intrusion into a person's home, workplace, automobile or other private zone. But these four defendants entered a stranger's car. If a person may not reasonably expect privacy when dealing with the public in his own home, that person must expect even less privacy when dealing with the public on the streets and in the cars of strangers. *Hastings,* 119 Wn.2d at 232.[16]

In sum, we find that none of these conversations was

---

[16]Moreover, the way the authorities designed and carried out the operation meant that there was minimal prying or intrusion into any one else's privacy. The camera was trained on the passenger seat and window of Glass' car. It occasionally captured images of persons walking by. On a very few occasions in these cases, someone who did not deliver cocaine or discuss delivering cocaine was recorded having a word with Glass. But overall, the range of the recording equipment was narrow; the operation was designed to record only persons who approached or got in the car of a stranger, or who were to be seen or overheard on a public street. It did not indiscriminately record persons' conversations or intrude into any intimate or private domain. In *State v. Giles,* Judge Norma Huggins observed that Operation Hardfall was "confined to specific locations where drug trafficking is known to take place day in and day out . . . for many years." Giles Report of Proceedings, July 6, 1992, at 27–28. She also observed the operation did not sweep in "individuals randomly walking down the street . . . ., but only those persons who approached the car in these particular areas . . . where it is known drug sellers will approach cars." *Id.* at 28. She thought the surveillance intrusion was minimal because it did not involve "private activities taking place in one individual automobile where they do, I agree, have an expectation of right of privacy. *I am not sure that expectation is as great nor as well respected as that of a person randomly on the street, walking up to cars*

private. Each was a brief and routine sales conversation, just like any other, conducted or initiated on the street with a stranger. Each could not have been reasonably intended or expected to be private, secret, or confidential under the circumstances of Operation Hardfall.[17]

We emphasize that our ruling is limited to these 16 conversations where the defendants approached a stranger for brief, routine conversations on the street about drug sales. We are not suggesting or deciding that a conversation is not private solely because it takes place on a street or solely because it relates to a commercial or illegal transaction.[18] Clearly, there are many commercial and/or illegal transactions that may involve private conversations. These conversations may involve relationships and transactions wholly unlike the anonymous and spontane-

*with which they have no, at least, privacy interest or personal privacy interest and offering, as purportedly in this case, to sell drugs." Id.* at 30-31 (emphasis added).

[17]The dissent would reverse the convictions of four defendants who publicly agreed to sell cocaine and then entered Glass' car alone. The dissent argues these conversations were private because by entering the car alone, these defendants sought privacy, and the Legislature did not intend to exclude *all* conversations in business transactions simply because the participants were strangers. We disagree for two reasons. First, we consider the totality of the circumstances, rather than considering each factor alone, as the dissent appears to do. Here, the four encounters with which the dissent is concerned were brazen public sales transactions. See n.15 *supra*. Second, the controlling factor is not merely that Glass was a stranger, but each conversation was a routine sales conversation, the same as with any other member of the purchasing public. Such conversations were not reasonably expected to be private even if conducted in a private place. *Hastings*, 119 Wn.2d at 232. We can expect vendors of illegal goods who sell to the public to seek as much secrecy as possible, consistent with their need to market their wares to consumers. However, if they are dealing with the public, they cannot *reasonably* expect privacy in their routine sales conversations. The contrary view amounts to concluding the Legislature intended to confer greater Privacy Act protection to illegal narcotics sellers than to legitimate merchants. We disagree with this conclusion.

[18]In *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995), the Ninth Circuit Court of Appeals vacated on procedural grounds a declaratory judgment that the Privacy Act does not prohibit recording a conversation at a public demonstration. The court noted that this court has not decided whether one may "with impunity" tape any conversation on a public street. *Fordyce v. Seattle*, 55 F.3d at 440 n.2. We do not hold that RCW 9.73 authorizes such a blanket policy. Instead, a case-by-case determination is required by RCW 9.73, considering all relevant factors as to a person's expectation of privacy.

ous street–level transactions here.[19] We also make no suggestion in this opinion that law enforcement officials should electronically intercept or record *private* conversations without complying with the requirements in the Privacy Act. Whenever a suspect is known in advance of recording, law enforcement officials should not find it difficult to obtain the requisite authorization under RCW 9.73.

## Conclusion

The Privacy Act, RCW 9.73, is designed to protect private conversations from governmental intrusion. The conversations here were not private for purposes of that Act where they were brief, involved strangers on a public street, and concerned the terms of routine drug transactions. Some of the conversations actually took place in the presence of third persons. We are unprepared to rule that the Legislature intended to provide privacy protection to street–level illegal narcotics sellers under these market-place circumstances.

The Court of Appeals decisions as to the admissibility of the recordings and the convictions of the defendants in these cases are affirmed. The cases are remanded for such further proceedings as may be required under the terms of the Court of Appeals decisions.

DURHAM, C.J., and DOLLIVER, SMITH, and GUY, JJ., concur.

---

[19]*See, e.g., State v. Salinas,* 121 Wn.2d 689, 693, 853 P.2d 439 (1993) (officer "wired" for meeting to buy $66,000 of cocaine in defendant's apartment); *State v. Salinas,* 119 Wn.2d 192, 829 P.2d 1068 (1992) (informant wired for meeting to sell 1.25 kilograms of cocaine); *State v. Moore,* 70 Wn. App. 667, 855 P.2d 306 (1993) (arranged $5,000 buy), *review denied,* 123 Wn.2d 1008, 869 P.2d 1084 (1994); *State v. Cisneros,* 63 Wn. App. 724, 821 P.2d 1262 (arranged deals), *review denied,* 119 Wn.2d 1002, 832 P.2d 487 (1992).

In *State v. Fjermestad,* 114 Wn.2d 828, 791 P.2d 897 (1990), a case whose facts predated the Omnibus Drug Act, we did not discuss or decide whether the particular intercepted conversation was private. There, a county sheriff's office required many officers to wear body wires for seven months, ostensibly for reasons of officer safety. This broadly sweeping policy clearly put a great many private conversations at risk of being unlawfully intercepted.

ALEXANDER, J. (concurring in part, dissenting in part) — I concur with the majority insofar as it concludes that the conversations between 12 of the defendants and the police informant that took place in front of third parties or in a public thoroughfare were not private conversations and, therefore, find no protection in RCW 9.73, Washington's privacy act.

However, in regard to the conversations that were recorded between the remaining four defendants and the informant, after each of those defendants entered Glass's car and was alone with him, I find I disagree with the majority's conclusion that these conversations were not private. I also do not believe that the recordings of those private conversations were properly authorized by a judge and, as a consequence, were not admissible in evidence. I, therefore, dissent to the portion of the majority opinion that affirms the convictions of defendants Piggee, T.L.C., Harris, and C.R.G., the four individuals whose conversations were recorded as they sat alone with the informant inside the informant's car.

## Private Nature of the Conversations

On the issue of whether these four conversations were "private," I find the majority's reliance on the fact that the interaction between Glass and these defendants was *visible* to any passersby particularly unpersuasive. The majority compares this to the circumstances in *State v. Drumhiller*, 36 Wn. App. 592, 675 P.2d 631, *review denied*, 101 Wn.2d 1012 (1984), where the defendants were consuming controlled substances in front of a picture window. There, the Court of Appeals rightly concluded that "objects, activities, or statements that he [the defendant] exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep to himself has been exhibited." *Drumhiller*, 36 Wn. App at 595 (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring)). The problem with this analogy is that the four defendants whose

conversations took place in the car where they were *alone* with Glass did not expose their statements to outsiders. Unlike the drug activity in *Drumhiller*, which could be observed from outside the house, the conversations at issue herein could not be heard from outside the car. Each defendant exhibited the intention to keep to himself by entering the car where passersby would be unable to hear the conversation that ensued.[20]

The majority emphasizes that these four defendants either expressly or implicitly agreed to provide Glass with cocaine while standing in plain view on the street before entering the more private environment of the car. The majority seems to suggest that this public initiation of the conversation somehow diminishes the private character of any subsequent conversation. I disagree. It seems more logical to conclude that when the defendants deliberately moved off a public thoroughfare and into an enclosed space to converse, that conversation was intended to be private.

The final factor influencing the majority is that Glass was a stranger to each of these defendants. While the lack of any preexisting relationship may, in certain circumstances, make it less reasonable for a person to expect that any confidences shared between the parties will be respected, it seems unlikely that the Legislature intended to exclude *all* conversations between people in business transactions simply because they were strangers. If it had, it would have been simple enough to draft such a limitation.

### Authorization to Record

Because I would hold that the conversations of these

---

[20]The Court of Appeals disagreed, "find[ing] no evidence [to] suggest[ ] that those Appellants who entered the automobile did so out of a desire to keep the conversation private. Rather, they entered the automobile because doing so was necessary to complete the transaction with Glass, who remained inside the automobile at all times during the recorded transactions." *State v. D.J.W.*, 76 Wn. App. 135, 142 n.2, 882 P.2d 1199 (1994), *review granted*, 126 Wn.2d 1008 (1995). The court does not explain why it was "necessary" for these defendants to enter the car in order to complete the transaction when others were able to do so from outside the car.

four defendants were private and thus protected by the privacy act, it is necessary for me to address an issue not confronted by the majority. That issue is whether these recordings were properly authorized by a judge.

As the Court of Appeals observed in the consolidated appeals by 10 of these defendants, this state's privacy act was not intended to authorize judges to grant "a 'roving commission' to randomly record conversations with any nonconsenting party." *State v. D.J.W.,* 76 Wn. App. 135, 145, 882 P.2d 1199 (1994), *review granted,* 126 Wn.2d 1008 (1995).[21] Before the recording of any private conversation may be authorized, a judge must find that "there is probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony." RCW 9.73.090(2). Although the probable cause determination need not be based on constitutional probable cause principles, the reviewing court is " 'to decide if the facts set forth in the application were minimally adequate to support the determination that was made.' " *State v. Knight,* 54 Wn. App. 143, 150-51, 772 P.2d 1042 (quoting *United States v. Scibelli,* 549 F.2d 222, 226 (1st Cir.), *cert. denied,* 431 U.S. 960 (1977)), *review denied,* 113 Wn.2d 1014 (1989).

The foundation of a judge's probable cause determination must be a finding of compliance with RCW 9.73.130. That statute provides that an application for authority to record communications or conversations is to contain a "particular statement of the facts relied upon by the applicant to justify his belief that an authorization should be issued." RCW 9.73.130(3). The statement is to include: the identity, if known, of the person whose conversation is to be recorded; the details as to the particular crime that has been or is about to be committed; the type of communica-

---

[21]"Operation Hardfall" resulted in charges being brought against approximately 100 defendants in King County Superior Court. *State v. D.J.W.* is a consolidated appeal by 10 of those defendants. The appeals of six other defendants whose convictions came about as a result of Operation Hardfall were consolidated with the appeals of the defendants in *State v. D.J.W. See* Majority Op. at 220.

tion or conversation that is to be recorded; and a showing of "probable cause" to believe that such communication will occur at the place where the recording is to take place. In addition, it is to set forth the location and manner of the recording, the length of time the recording is to be maintained, and facts showing that other normal investigative procedures have been tried and failed. RCW 9.73.130(3)(a)–(f).

The application that was presented to the judge who authorized the recordings of the private conversations between the police informant and prospective defendants did not set forth facts that are minimally sufficient to justify a recording of those conversations. The application, which was presented by veteran Seattle Police Department Captain William Bryant, merely indicated that the informant who was to be utilized in the so-called "Operation Hardfall" had been involved in a similar operation in California, that this informant had successfully purchased drugs in two of the areas designated as "high narcotics trafficking locations," and that there was probable cause to believe that "street traffickers dealing drugs in high narcotics trafficking areas of Seattle and unincorporated King County are about to commit" violations of the controlled substances act. Clerk's Papers at 98, 93. Rather than demonstrating the ineffectiveness of other investigative techniques that may have been employed, the application indicated only that the recording of these conversations was necessary for the safety of the informant and because his credibility would be subject to attack.

The application here was not a "particular statement of the facts" and, therefore, did not justify the authorization for recording. Specifically, it was deficient because it gave the issuing judge an inadequate and overly generalized description of the geographic areas where the informant would be recording conversations and it did not name or identify the parties whose conversations were to be recorded. Although an application for a recording needs

only to describe the nonconsenting parties with "reasonable certainty under the circumstances," RCW 9.73.090(5), the application with which we are here concerned did not describe the persons whose conversations were ultimately recorded with any degree of certainty.[22] It merely said that the informant was to "drive through the high narcotics trafficking areas referred to earlier [SODAs][23] for about a two hour period. He will purchase narcotics in transactions initiated in these areas or within 1,000 feet of their boundaries." Clerk's Papers at 97. According to the application, the recording equipment was to be in "continual operation" throughout the process. Clerk's Papers at 97.

While judges who authorize recordings pursuant to the privacy act have considerable discretion to determine whether the act's safeguards have been satisfied, the judge's discretion is not unbridled. Fundamentally, the law enforcement officer received precisely the "roving commission" that the Court of Appeals warned against in *State v. D.J.W.* The authorization allowed the police informant to record conversations he held with anyone who approached him or entered his car in a geographical area that included a large portion of downtown Seattle, and several other large areas of King County including portions of West Seattle, North Seattle and the Central District.[24] Such a broad license to record private conversations is, in my judgment, beyond the pale of the privacy act. I would, therefore, hold that the recordings of the private conversations with Piggee, T.L.C., Harris, and C.R.G. that took place in the informant's car were

---

[22]Defendants Piggee, T.L.C., Harris and C.R.G. were not named in the application. They were merely swept up in the wide net cast by the judge who issued the authorization. Indeed, the application did not name any of the approximately 100 defendants who were charged with offenses as a result of Operation Hardfall.

[23]*See* Majority Op. at 216 n.3.

[24]*See* Majority Op. at 216.

improperly authorized and, therefore, should have been suppressed. RCW 9.73.050.[25]

JOHNSON and MADSEN, JJ., and PEKELIS, J. Pro Tem., concur with ALEXANDER, J.

[No. 62805-0. En Banc.]
Argued September 27, 1995.    Decided May 9, 1996.

---

[25]RCW 9.73.050 provides in part: "Any information obtained in violation of RCW 9.73.030 . . . shall be inadmissible."