
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74548-4-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| KEVIN JAMES EVERSON, | ) ) | |
| Defendant, | ) ) | UNPUBLISHED OPINION |
| TYLER BAM BOWMAN, and each of them, | ) ) ) | FILED: July 10, 2017 |
| Appellant. | ) ) ) | |

BECKER, J. — Appellant Tyler Bowman, convicted of burglary along with co-defendant Kevin Everson, alleges two errors in the admission of evidence. A detective was allowed to give his opinion that Everson was the person whose image was captured in a surveillance video of the burglary. Another officer was allowed to testify that Bowman and Everson were seen together shortly after the alleged burglaries under suspicious circumstances. Finding no abuse of discretion, we affirm.

The images of two men were captured by surveillance video as they were burglarizing a yoga studio and a restaurant in Kirkland around 4 a.m. on January 20, 2015. The videotapes showed them approaching the restaurant from the

outside, then crawling along the floor toward a safe. They fled when an alarm was triggered.

Detective Clayton Slominski extracted still frame photographs of the faces of the two men from the video. He had the photographs sent to regional law enforcement agencies to see if anyone might be able to identify the suspects. Everett detective Michael Atwood saw the photographs, recognized Bowman, and contacted Slominski. Slominski then e-mailed the photographs to Staci Rickey, Bowman's community corrections officer, who also recognized Bowman.

Three weeks later, Bothell police officer Michael Szilagyi contacted Slominski and said he had seen Bowman with Kevin Everson. Slominski pulled Everson's driver's license photo and concluded that Everson was the other man in the surveillance video.

Bowman and Everson were each charged with two counts of burglary in the second degree. They were tried together. Neither testified. The primary issue was whether they had been properly identified as the men in the video.

At trial, Atwood and Rickey identified Bowman in the still image taken from the surveillance video. Atwood testified that he recognized Bowman within seconds of seeing the still image. He said he had known Bowman for eight years and met with him about eight times. He said he recognized Bowman's distinctive sharp jawline and cheekbones. Rickey testified that she too recognized Bowman's sunken cheeks and distinct nose and jawline in the still image. She said she had known Bowman for over a year and had met with him eight times, including the day before the charged burglaries.

2

The jury heard evidence derived from Bowman's cell phone records that his cell phone pinged off a tower one half mile away from the location of the burglaries at 3:35 a.m. the morning of the burglaries.

The jury found Bowman and Everson guilty as charged. Bowman appeals.

## IDENTIFICATION OF EVERSON

Before trial, Bowman and Everson moved to prevent the State's witnesses from identifying them in the surveillance video. The court denied the motion.

At trial, in addition to the testimony of Atwood and Rickey identifying Bowman, Detective Slominski testified that Everson was one of the men depicted in the video. Bowman joined Everson's motion for a mistrial alleging that allowing Slominski to make this identification of Everson was prejudicial error. The court denied the motion: "I think that the time spent with the defendant . . . and the close proximity between the defendant and the detective warrant his ability to make a lay opinion about who he believes is depicted in the surveillance video."

Bowman assigns error to this ruling. We review for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

A lay witness may give opinion testimony if it is rationally based on the perception of the witness and helpful to a clear understanding of the testimony or the determination of a fact in issue. ER 701. A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify

3

the defendant from the photograph than is the jury. State v. Hardy, 76 Wn. App. 188, 190, 884 P.2d 8 (1994), aff'd, 129 Wn.2d 211, 916 P.2d 384 (1996).

Slominski stated his opinion that Everson was the person pictured after having spent only an hour with Everson in person. The Ninth Circuit has discussed the reasons why such testimony runs the risk of invading the province of the jury:

> Lay opinion testimony of the type given by Miller is of dubious value. The jury, after all, was able to view the surveillance photos of LaPierre and make an independent determination whether it believed that the individual pictured in the photos was in fact LaPierre. Miller's testimony therefore ran the risk of invading the province of the jury and unfairly prejudicing LaPierre. For these reasons we have held that while lay opinion testimony of this sort is sometimes permissible, "the use of lay opinion identification by policemen or parole officers is not to be encouraged, and should be used only if no other adequate identification testimony is available to the prosecution." United States v. Butcher, 557 F.2d 666, 670 (9th Cir. 1977). . . .
> . . . There was no evidence that LaPierre's courtroom appearance and his appearance at the time of the robbery were significantly different. Moreover, Miller not only did not know LaPierre, he had never even seen him in person. Miller's knowledge of LaPierre's appearance was based entirely on his review of photographs of LaPierre and witnesses' descriptions of him. We can perhaps imagine a hypothetical scenario in which a witness who knew a defendant only through photographs nonetheless had become sufficiently familiar with his appearance to give lay opinion testimony of this sort. But this is not such a case. Miller's level of familiarity with LaPierre's appearance falls far short of that required by our cases and by Rule 701's requirement of helpfulness. Whether the person sitting before the jury was the one pictured in the surveillance photographs was a determination properly left to the jury.

United States v. LaPierre, 998 F.2d 1460, 1465 (9th Cir. 1993).

Notwithstanding these concerns, we held in Hardy that an officer's opinion testimony was properly admitted. In Hardy, a consolidated appeal, a police

4

officer identified two defendants as the individuals shown on a "somewhat grainy videotape" that was introduced at trial. Hardy, 76 Wn. App. at 191. The officer testified that he had known one defendant for "several years" and the other defendant "for 6 or 7 years and considered him a friend." Hardy, 76 Wn. App. at 191-92. Affirming, this court held the trial court did not err in admitting the officer's identification testimony. Because of the officer's longstanding relationship with each defendant, the officer was in a better position than was the jury to determine whether they were the persons shown in the videotape. Thus, the officer's testimony "was helpful to the jury." Hardy, 76 Wn. App. at 191.

Bowman argues that his case is more like State v. George, 150 Wn. App. 110, 206 P.3d 697, review denied, 166 Wn.2d 1037 (2009). In George, the trial court abused its discretion in allowing a detective to identify the two defendants as the individuals depicted in a surveillance video of a motel robbery. George, 150 Wn. App. at 119. The detective had observed one defendant as he got out of a van and ran away, and at a hospital later that evening. The detective had observed the other defendant while he was getting out of a van and being handcuffed and later while he was at the police station in an interview room. George, 150 Wn. App. at 119. It is not clear exactly how long the detective spent observing either defendant. The detective could not make out facial features in the surveillance video. He identified the defendants in the video by "each defendant's build, the way they carried themselves, the way they moved, what they were wearing, how they compared to each other, and how they compared to the rest of the people in the van, and from speaking with them on the day of the

crime." George, 150 Wn. App. at 119 (footnote omitted). On appeal, the court held that the detective's contacts with the defendants fell "far short of the extensive contacts in Hardy" and did not support a finding that the officer knew enough about the defendants to express an opinion that they were the robbers shown on "the very poor quality video." George, 150 Wn. App. at 119.

Here, Slominski interviewed Everson for about 45 minutes sitting 3 or 4 feet across from him at a small table in a small jail interrogation room. Three days later, Slominski arrested Everson and spent about 15 minutes with him at that time. Slominski had not known Everson previously, but he had a better opportunity to become familiar with Everson's appearance than was the case in George. Another difference from George is that the image Slominski had for comparison showed Everson's facial features fairly clearly. Slominski's face-to-face interview of Everson and his opportunity to observe him at close quarters while arresting him provide a tenable basis for concluding that Slominski was more likely than the jury to correctly identify Everson from the video images.

The jury viewed the surveillance video and the still images captured from the video, and had Everson's driver's license photo to use for comparison as well. In closing, the State asked the jury "to look at the video and make the comparison yourself to the still images that you will have with you in evidence, to that of Mr. Everson." Like in Hardy, the jury was free to disbelieve the detective's testimony and reach its own conclusion on the issue of identification. Like in Hardy, we reject the appellant's argument that the detective's opinion testimony invaded the province of the jury.

Because there was some basis for concluding that Slominski was more likely to correctly identify Everson than was the jury, the trial court did not abuse its discretion in allowing Slominski to identify Everson in the video.

POSTBURGLARY ENCOUNTER

Before trial, Bowman moved to exclude Officer Szilagyi's testimony about his encounter with Bowman and Everson a few weeks after the burglary. The trial court denied the motion.

Officer Szilagyi testified that he was on patrol in Bothell around 3 a.m. on February 12, 2015, when he saw Bowman and Everson walking together through a parking lot of closed businesses. He approached them because "I thought that to be strange. There's no open businesses in the area at that time, and it's not really a pedestrian traffic area. So it seemed a little bit suspicious to me that there would be two people walking through the parking lot at that time." They gave him their names, and he confirmed the names were correct. He testified the men told him they were waiting for a friend so that they could check into a nearby hotel room, and he said there were in fact two hotels fairly nearby. The officer said his entire contact with the men lasted two to three minutes. He said the men were not evasive and did not try to run away.

Bowman argues that Officer Szilagyi's testimony was irrelevant and unfairly prejudicial.

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 401.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. ER 403.

The State had to prove Bowman and Everson were the burglars pictured on the surveillance video. Apart from the video itself, Officer Szilagyi's testimony was the only evidence linking the two defendants. As the State argued in closing, the officer's testimony showed that the defendants "are not strangers to one another. They know one another, they hang out together." This made it more probable that Bowman and Everson were the two men shown in the surveillance video.

Bowman argues that the evidence was extraordinarily prejudicial because it suggested to the jury that the defendants were surveying possible locations to commit a second, similar crime. Officer Szilagyi did say that finding Bowman and Everson in the parking lot of closed businesses at three in the morning was "a little bit suspicious," but he then testified they did not try to avoid him, they provided proper identification, and they had a plausible reason for being there. The State used the officer's testimony only as evidence that Bowman and Everson knew each other. Because Bowman has not shown that the probative value was substantially outweighed by the danger of unfair prejudice, we find no abuse of discretion in the admission of Officer Szilagyi's testimony.

No costs will be awarded on appeal unless the State provides evidence that Bowman's financial circumstances have significantly improved since the trial court's finding of indigency. RAP 14.2.

Affirmed.

WE CONCUR:

_Dunn, J._

_Becker, J._

_Cox, J._