598

[No. 41123-7-II.   Division Two.   June 5, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. DONALD BABCOCK, *Appellant*.

*Lisa E. Tabbut*, for appellant.

*Robert M. McKenna, Attorney General,* and *John C. Hillman, Assistant,* for respondent.

¶1 ARMSTRONG, J. — Donald Babcock appeals his convictions for conspiracy to commit first degree murder, solicitation to commit first degree murder, and felony harassment, arguing that police recordings of his conversations with an undercover agent violated his rights under Washington's "Privacy Act." In a statement of additional grounds, Babcock asserts that the State maliciously prosecuted him and violated his right to counsel by questioning him in jail, and that his counsel ineffectively represented him. RAP 10.10. Finding no reversible error, we affirm.

## FACTS

A. <u>Background</u>

¶2 In 2004, a jury convicted Donald Babcock of child molestation and child rape (2004 case). Harley Turner was

the biological father of one of the children Babcock allegedly molested and raped. Lieutenant Reggie Bartkowski was the lead investigator and a witness in the 2004 trial. Deputy Prosecutor Shawn Anderson prosecuted the 2004 case. Babcock appealed the 2004 convictions, and Division Three of this court reversed and remanded for retrial in Klickitat County. While awaiting retrial on the 2004 case, the police began investigating the present charges (2010 case).

## B. Present Case

¶3 In 2009, several inmates informed law enforcement that Babcock was making threats against people related to the 2004 case, including Turner and Lieutenant Bartkowski. To investigate those threats, Sergeant Jay Hunziker of the Goldendale Police Department enlisted the help of Special Agent Eric Floyd from the federal Bureau of Alcohol, Tobacco, and Firearms.

¶4 One of the jail informants, August "Jimmy" Law, set the stage for Agent Floyd to meet with Babcock at the jail. Law asked Babcock if he was serious about the threats against Lieutenant Bartkowski and Turner. He told Babcock that he knew a guy, "Eric Schmidt" (Agent Floyd's undercover alias), who was a hit man and could take care of the problem. Babcock added Schmidt to his approved visitors list so Schmidt could visit him at the jail.

¶5 On February 21, 2009, Agent Floyd, as "Eric Schmidt," visited Babcock. The two met in the visitors' room, which has three cubicles with glass separating the inmate from the visitor and a phone-like mechanism to talk through. The cubicles have separators so that three inmates can have visitors at the same time. Posted signs state that conversations in the visiting room are subject to monitoring by the jail administration. A chime notifies the inmates that the monitoring system is engaged. The monitoring system cannot record the conversations over the phone-like device.

¶6 Sergeant Hunziker applied for and received court authority to record this conversation without Babcock's

permission. He placed the recorder in a cubicle underneath the table on Babcock's side of the visiting room. The recording, although garbled, picked up parts of what Babcock said. Agent Floyd also wore a recording device, but it failed.

¶7 At their first meeting, Babcock said that "he wanted to have a couple of people killed" and identified Turner and Lieutenant Bartkowski as the targets. Report of Proceedings (RP) at 57. Agent Floyd said that he would kill the "snitch" (i.e., Turner) for free, but Babcock had to pay him to kill a police officer. RP at 58. The two discussed payment options but were unable to agree. Instead, at Babcock's request, Agent Floyd provided an undercover phone number and address. The meeting lasted approximately 15 minutes.

¶8 Agent Floyd received a letter from Law stating that Babcock was interested in "Schmidt's" services and that payment options were being discussed. RP at 91. Agent Floyd wrote to Babcock, stating that he would return to the jail the following week and that Babcock should bring a pad of paper and a pen.

¶9 The second meeting, on March 26, 2009, lasted approximately 30 minutes. Sergeant Hunziker again received authority to record the meeting. Sergeant Hunziker set up another audio recording device, but it failed. Agent Floyd was also equipped with an audio/video recording device, but the system picked up very little audio and only some unclear images of this meeting.

¶10 At the start of the second meeting, Agent Floyd told Babcock that they should not talk over the telephones but instead should write messages and hold them up to the window. For the rest of the meeting, the two communicated with paper notes. Agent Floyd's notes were entered into evidence at the CrR 3.5 hearing. The police never recovered Babcock's notes of the meeting. Immediately after the meeting, Agent Floyd made notes of what he remembered

Babcock writing down and incorporated those into his report.

¶11 At the CrR 3.5 hearing, Agent Floyd testified that he told Babcock he had found Turner and asked, "Are you sure you want him done?" RP at 68. Babcock pointed to a note that said "10-4," which Agent Floyd believed meant "okay." RP at 68. The two discussed payment for the job and Babcock agreed to pay with methamphetamine. But when Agent Floyd wrote, "When I leave here, we have a deal. Harley's f***ing dead," Babcock hesitated and asked for a few days to consider his final decision. RP at 71. Babcock said he would write to Agent Floyd with a simple "yes" or "no" for the decision. RP at 71-72.

¶12 Agent Floyd received a letter from Babcock that stated, "The answer to the question is 'yes.' " RP at 73. Agent Floyd and Sergeant Hunziker traveled to Idaho where Turner lived. With Turner's cooperation, Agent Floyd and Sergeant Hunziker staged Turner's murder and took pictures of the scene. The pictures show Turner alive with duct tape around his hands and across his mouth, and an after shot with Turner in a shallow grave with fake blood and brain matter on the back of his head. Agent Floyd took pictures with his undercover cell phone and a digital camera.

¶13 Agent Floyd met with Babcock again for approximately 11 minutes on April 23, 2009. During the meeting, Sergeant Hunziker videotaped the monitors in the control room, which showed Babcock entering the visiting room, talking with Agent Floyd, and then leaving the visiting room; the monitors did not pick up any audio. Agent Floyd wore an audio/video recording device, but again the device failed. The two communicated by writing notes back and forth. Agent Floyd first showed Babcock the pictures of Turner's staged murder from his cell phone. Agent Floyd said he had received Babcock's payment and suggested that if Babcock wanted more work done, he was available, but he needed to be contacted soon, before he got rid of the

address and cell phone. As Agent Floyd stood up to leave, Babcock wrote, "Thank you." RP at 79.

C. Procedure

¶14 The State charged Babcock with conspiracy to commit first degree murder, solicitation to commit first degree murder, and felony harassment. On the first day of trial, the court heard arguments on Babcock's motion to suppress his recorded statements to Agent Floyd on Privacy Act grounds. The trial court denied the motion, explaining that Babcock lacked any objective expectation of privacy in the conversations and they fit within the Privacy Act exception that allows recording threats of bodily harm. The trial court also ruled that the affidavits in support of the wiretaps were legally sufficient.

ANALYSIS

PRIVACY ACT

¶15 Babcock argues that the trial court should have suppressed the recordings of his communications with Agent Floyd because he did not consent to the recordings and no exception applies to this situation.

¶16 The Privacy Act in Washington states, in pertinent part:

> (1) Except as otherwise provided in this chapter, it shall be unlawful for any individual, . . . or the state of Washington, its agencies, and political subdivisions to intercept, or record any:
>
>     . . . .
>
>     (b) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation.

RCW 9.73.030. The legislature intended broad protection of individuals' privacy rights. *See* ch. 9.73 RCW; *see also State*

*v. Williams*, 94 Wn.2d 531, 548, 617 P.2d 1012 (1980). Recordings or information obtained in violation of the Privacy Act are inadmissible in court. RCW 9.73.050.

A. Expectation of Privacy

¶17 Babcock first argues that the trial court erred in finding the conversations were not private.

¶18 Generally, whether a communication is private is a question of fact, but where the facts are undisputed, the determination becomes a question of law. *State v. Christensen*, 153 Wn.2d 186, 192, 102 P.3d 789 (2004). The Privacy Act protects only private conversations. *State v. Clark*, 129 Wn.2d 211, 224, 916 P.2d 384 (1996) (citing *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 189, 829 P.2d 1061 (1992)). The term "private" is given its ordinary meaning, which is " 'belonging to one's self ... secret ... intended only for the persons involved (a conversation) . . . holding a confidential relationship to something ... a secret message: a private communication . . . secretly: not open or in public.' " *State v. Townsend*, 147 Wn.2d 666, 673, 57 P.3d 255 (2002) (alterations in original) (internal quotation marks omitted) (quoting *Kadoranian*, 119 Wn.2d at 190).

¶19 We determine whether a communication is private by asking (1) whether the parties manifest a subjective intent to have a private conversation and (2) whether such intent is objectively reasonable. *State v. Modica*, 136 Wn. App. 434, 448, 149 P.3d 446 (2006). In answering those questions, we can consider (1) the "duration and subject matter of the communication," (2) the "location of the communication and the presence of potential third parties," and (3) the "role of the nonconsenting party and his or her relationship to the consenting party." *Townsend*, 147 Wn.2d at 673-74 (citing *Clark*, 129 Wn.2d at 225-27).

¶20 Inmates have a lesser privacy expectation while incarcerated. *Modica*, 136 Wn. App. at 448. Although inmates do not lose all constitutional protections while in

custody, reducing an inmate's Fourth Amendment privacy protection is justified by the needs and objectives of the prison institution, especially safety within the facilities. *Hudson v. Palmer*, 468 U.S. 517, 524-26, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (inmate did not have a privacy interest in his cell), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *see also United States v. Hearst*, 563 F.2d 1331, 1345-46 (9th Cir. 1977) (taping a conversation between an inmate and her visitor did not violate the Fourth Amendment). Similarly, an inmate has diminished privacy rights under Washington's Privacy Act and inmates should expect reduced privacy rights. *See Modica*, 136 Wn. App. at 448 (inmate did not have a reasonable privacy interest in his phone calls while incarcerated); *State v. Haq*, 166 Wn. App. 221, 260, 268 P.3d 997 (2012) (introduction of defendant's jailhouse phone calls into trial did not violate defendant's privacy rights), *petition for review filed*, No. 87116-7 (Wash. Mar. 13, 2012).

¶21 In *Modica*, an inmate made several phone calls to his grandmother, encouraging her to tell his alleged victim not to testify at his trial. *Modica*, 136 Wn. App. at 438-39. All phone calls were recorded and subject to monitoring, and both parties to the phone call were warned of possible monitoring at the outset of every call. *Modica*, 136 Wn. App. at 439. In addition, the jail had posted signs that the phone calls were recorded and subject to monitoring. *Modica*, 136 Wn. App. at 449. The court held that under these circumstances, the defendant could not have reasonably expected privacy. *Modica*, 136 Wn. App. at 449.

¶22 Here, the "duration and subject matter of the conversation" weigh in Babcock's favor because the conversations were fairly lengthy and covered a serious matter not normally intended to be public. *See Clark*, 129 Wn.2d at 225. In contrast to *Clark*, where the drug transactions usually took less than 2 minutes, the communications between Babcock and Agent Floyd lasted between 10 and 30

minutes. In addition, an inmate could reasonably expect more privacy in hiring a hit man than in entering into a drug transaction. *See Clark*, 129 Wn.2d at 231-32 (other communications about illicit activities "may involve relationships and transactions wholly unlike the anonymous and spontaneous street-level transactions here").

¶23 The "location and possible presence of third parties" weighs most heavily against Babcock. *See Clark*, 129 Wn.2d at 225-26. All three communications occurred in the visitors' room, which had signs stating that the conversations could be monitored. The visitors' room allowed up to three inmates in the room at a time, and others could have easily overheard the conversations because the separators were minimal and not intended to soundproof each cubical. Generally, where another person is present, a party to the communication has no expectation of privacy. *Clark*, 129 Wn.2d at 226.

¶24 Finally, "the role of the nonconsenting party and his relationship to the consenting party" also weigh against Babcock. *See Clark*, 129 Wn.2d at 226-27. Babcock chose to communicate with an unknown person, Agent Floyd, and he had no reason to trust that Agent Floyd was really a hit man. Thus, it was not objectively reasonable for Babcock to expect privacy when he revealed to Agent Floyd his intent to "have a couple of people killed." *See Clark*, 129 Wn.2d at 227.

¶25 Accordingly, we hold that Babcock did not have an objectively reasonable expectation of privacy in his conversations with Agent Floyd.

B. Statutory Exception for Conveying Threats

¶26 The trial court ruled that the recordings were also admissible because they fit within the statutory provision that excludes privacy protection for threats of bodily harm. Babcock argues that the exception does not apply because he did not convey a threat of bodily harm.

¶27 In passing the Privacy Act, "[t]he legislature intended to establish protections for individuals' privacy and to require suppression of recordings of even conversations relat[ed] to unlawful matters" if the recordings violate the statute. *Williams*, 94 Wn.2d at 548. RCW 9.73.030(2) sets out exceptions, including "wire communications or conversations . . . (b) which convey threats of extortion, blackmail, bodily harm, or other unlawful requests or demands." The word "convey" within this exception is broadly defined, and we apply its common meaning. *State v. Caliguri*, 99 Wn.2d 501, 507-08, 664 P.2d 466 (1983). To "convey" is to "impart or communicate either directly by clear statement or indirectly by suggestion, implication, gesture, attitude, behavior, or appearance." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 499 (1966). The phrase "unlawful requests or demands" applies to communications that convey matters similar to " 'extortion, blackmail, [or] bodily harm.' " *Williams*, 94 Wn.2d at 548 (quoting RCW 9.73.030(2)(b)).

¶28 In *Caliguri*, police recorded the defendant's conversation with a federal undercover officer in which the two discussed a planned arson. *Caliguri*, 99 Wn.2d at 504. During the discussion, the undercover officer suggested a bonus if somebody was killed in the fire. *Caliguri*, 99 Wn.2d at 504. The defendant acknowledged the possibility and stated, " '[T]he janitor's gonna go for sure' " and " '[A] few people are gonna take a fall.' " *Caliguri*, 99 Wn.2d at 504. The defendant argued that the threat exception to the Privacy Act did not apply because he had not actually conveyed a threat. The Supreme Court disagreed, holding that discussing the threat in the planning stages fell under the word "convey" and the trial court properly admitted the tapes under the bodily harm exception. *Caliguri*, 99 Wn.2d at 507-08.

¶29 Similarly here, the conversations between Babcock and Agent Floyd fell within the purview of the exception. Agent Floyd testified that at the first meeting, Babcock said that "he wanted to have a couple of people killed"

and named the targets. RP at 57. The second meeting was the planning stage of the conspiracy. Agent Floyd wrote, "I found Harley T. Are you sure you want him done?" RP at 68. Babcock responded, "10-4," which Agent Floyd understood as an affirmative response. RP at 68. Agent Floyd also wrote, "When I leave here, we have a deal. Harley's f***ing dead." RP at 71. Although Babcock did not agree to the deal that day, he later sent a letter confirming it. These conversations conveyed threats of bodily harm, which fall within the scope of the statutory exception under RCW 9.73.030(2)(b).

¶30 Babcock distinguishes his case from *Caliguri*, where the recordings capture the defendant explicitly recognizing the possibility of bodily harm in committing the underlying arson, by arguing that the recording must contain the defendant expressly making a threat of bodily harm. But the *Caliguri* court did not draw that distinction. Rather, it broadly construed "convey" to include all stages of the agreement and planning that contain threats of bodily harm. *Caliguri*, 99 Wn.2d at 507-08. Additionally, as the State points out, the statute states that all conversations conveying a threat of bodily harm may be recorded, thereby demonstrating that the legislature did not intend to limit the threat exclusion to conversations where the defendant expressly states the threat of bodily harm. *See* RCW 9.73.030(2).

¶31 We conclude that the trial court did not err in ruling, in the alternative, that Babcock's recorded conversations were not protected under the Privacy Act because they were threats of bodily harm.

## C. Sufficiency of Affidavits for Authorization

¶32 Finally, Babcock argues that Hunziker's affidavits for an intercept order were legally insufficient because the affidavits failed to specify the normal investigative procedures that are unlikely to succeed in this particular case.

¶33 Law enforcement may record private conversations if an officer is party to the conversation and obtains

prior authorization for the recording from a judge. Former RCW 9.73.090(2) (2006).[1] The judge must find there is "probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony." Former RCW 9.73.090(2). In reviewing the application, we " 'decide if the facts set forth in the application were minimally adequate to support the determination that was made.' " *State v. Manning*, 81 Wn. App. 714, 718, 915 P.2d 1162 (1996) (internal quotation marks omitted) (quoting *State v. Knight*, 54 Wn. App. 143, 150-51, 772 P.2d 1042 (1989)).

¶34 In applying for authorization, the applicant-officer must provide an affidavit that includes, among other information, "(f) A particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ." Former RCW 9.73.130(3)(f) (1977).[2] Circumstances sufficient to show a likely failure of normal investigative procedures include an inherently dangerous situation for the undercover agent, inherent proof difficulties, or proof of the defendant's actual knowledge is required and difficult to otherwise convey without the recording. *Knight*, 54 Wn. App. at 150. The latter encompasses the situation where the investigation has turned up circumstantial evidence that points to the defendant but is insufficient to convict, and a recording is needed to avoid a " 'one-on-one swearing contest' " between defendant and undercover agent. *State v. Platz*, 33 Wn. App. 345, 350, 655 P.2d 710 (1982).

¶35 Here, both of Sergeant Hunziker's applications stated that normal investigative procedures would be unsuccessful or too dangerous:

---

[1] In 2011, the legislature amended the statute to make it gender neutral. The amendments made no substantive changes.

[2] In 2011, the legislature amended the statute to make it gender neutral. The amendments made no substantive changes.

(e) Successful prosecution of this type of case requires proof of knowledge contained in a verbal exchange. Possession of this verbal exchange in the form of a recording resolves any issues as to *exactly* what was said, by whom, and in evidentiary value is worth dozens of witnesses testifying from their inexact memories. Furthermore, there are no other means readily available for obtaining such information. The inmate who came forward regarding the threats is not trained in investigative techniques or use of the equipment. Furthermore, the equipment would be difficult to get to the inmate and difficult for him to conceal. Discovery of the equipment by the suspect would obviously terminate the investigation and would likely jeopardize the safety and well-being of the inmate.

Clerk's Papers at 90, 97.

¶36 The affidavits here comply with the requirements of the statute. Sergeant Hunziker specified other methods of investigation considered and the inherent danger and likelihood that they would be unsuccessful. For example, Sergeant Hunziker points out that inmates are not trained in undercover work; thus, they are unskilled in identifying a serious threat among mere jailhouse chatter. And, he noted that the nature of the jail setting makes it dangerous for inmates to participate in an undercover investigation. We conclude that the affidavits were minimally adequate to show that other investigative methods would be insufficient; the trial court did not err in granting authority to record the conversations.

¶37 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

WORSWICK, C.J., and VAN DEREN, J., concur.