**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Parentage of K.R. | No. 53183-6-II |
| SHAIN WESLEY REED, | |
| Appellant, | |
| and | |
| NONNIE MARIE DAVIS, | UNPUBLISHED OPINION |
| Respondent. | |

GLASGOW, J.—Shain Wesley Reed petitioned for a parenting plan for his daughter, KR. KR's mother, Nonnie Marie Woodhead (formerly Nonnie Marie Davis),[1] did not agree to Reed's proposed plan, which would have placed KR with Reed the majority of the time.

At a bench trial, the trial court admitted a series of successive short recordings that Woodhead made of an incident between Woodhead's then-12-year-old son, CH, and Reed, where KR was also present. The recordings show Reed screaming profanities and threats within inches of CH's face, while CH remained still but appeared upset and afraid. The trial court relied on the recordings when it entered a parenting plan restricting Reed's contact with KR under RCW 26.09.191, but providing for increased contact over time with court approval at each step.

Reed appeals the trial court's decision to admit the recordings, arguing that they were admitted in violation of Washington's privacy act, chapter 9.73 RCW (Privacy Act). We hold that the trial court did not abuse its discretion in admitting the recordings because the threat exception to the all-party consent requirement under the Privacy Act applied. Only one party's consent was

---

[1] Ms. Woodhead changed her last name after the proceedings in Pierce County Superior Court, and we refer to her using her current name.

required under the exception, and Woodhead was a consenting party to the conversation. We affirm.

FACTS

A.    Background

Reed and Woodhead began dating in 2010. They never married. Woodhead had two sons from a prior relationship who resided with her full time, CH, who is currently 16, and C, now 19.

In August 2012, Reed, Woodhead, CH, and C moved into Reed's mother's farm in Roy, Washington. Reed's mother, Mary Gall-Scudder, also lived on the farm.

In March 2013, Reed and Woodhead's daughter, KR, was born. When KR was four years old, Woodhead attempted to end her relationship with Reed and left the farm. Woodhead, CH, C, and KR temporarily moved in with Woodhead's brother and his girlfriend. When Woodhead returned to Reed and the farm, C remained at his uncle's house for several more months because he was afraid to return.

Reed and Woodhead separated for the final time in October 2017, shortly after the recorded incident that is at issue in this case. When Woodhead left the farm, she tried to take KR with her, but Reed refused. Reed filed a petition for a parenting plan and child support the next day. For the next several months, Reed would not let Woodhead have contact with KR, although Woodhead made repeated requests to see and speak to her daughter.

In December 2017, Woodhead filed for a domestic violence protection order against Reed, and in January 2018, the court granted a six-month order for protection. Around the same time, an agreed temporary parenting plan was entered allowing KR to be with Woodhead every other weekend, from Friday to Tuesday. Woodhead testified that she agreed to the temporary plan

because she was "afraid that was the most [she] was going to be able to see [her] daughter." 2 Verbatim Report of Proceedings (VRP) at 230.

B.        Parenting Plan Trial

The parties could not agree to a permanent parenting plan, and the case proceeded to a bench trial. At trial, multiple witnesses testified about Reed and Woodhead's relationship and Reed's treatment of CH and C, who were 12 and 14 when the relationship ended in October 2017.

Reed often imposed physical punishments on the boys, starting when they were about 10 and 12 years old. Michelle Defur, a longtime family friend who visited the farm regularly, recalled that Reed's treatment of the boys "was brutal . . . a lot of hard work and yelling and a lot of violence." 1 VRP (Jan. 30, 2019) at 70. The boys were required to do physically demanding farm work, including carrying 60 to 80 pound bales of hay on their backs and taking pallets back and forth to repair fences. When several goats became sick, the boys had to dig graves for them, sleep overnight in the unheated garage or a shed with the sick goats, and then bury the goats in the graves when they died. When repairing an electric fence, Reed made Woodhead and the boys test the wires with their hands to see if the electricity was working.

Dolanna Burnett, Reed's employer, recalled that Reed was "extremely rough with the boys," that the boys seemed to be constantly punished, and they had very strict guidelines for what they were and were not allowed to do. *Id.* at 124. Reed's method of getting CH's attention was to grab him under the chin. Reed would also shove the boys, hold them down on the table, and lift them in the air by their necks.

As punishment, Reed made the boys run about 100 feet, from one end of the field to the driveway, do push-ups, and run back the other way multiple times. When the boys' arms were tired and they couldn't complete the push-ups, Reed held his foot on their backs until he could feel

his foot being raised. The boys complained at school that their arms and legs hurt, and the school notified Child Protective Services (CPS). Following an investigation, CPS issued a protective action plan identifying the present danger to the boys as inappropriate discipline. The plan indicated that Woodhead would be the only disciplinarian and that Reed would not discipline the boys.

Despite the protective action plan, physical discipline continued. At trial, Reed testified that he knew he could no longer discipline the boys but admitted to verbally disciplining them anyway. Reed testified, "I was told not to correct [the boys] by putting my hands on them. I was told that I could not make them run laps, do push-ups, do jumping jacks." *Id.* at 39.

One Easter, the parties went on a trip and were playing in the river, but when C got his pants wet, Reed punished him by shoving C into the river and causing injury to the bottom of his feet. When asked why she did not confront Reed about his discipline of the boys, Woodhead stated, "I was scared. And if I was to confront him then the punishment would always end up being worse." *Id.* at 137.

Reed often used vulgar language with the boys. Witnesses testified that Reed would make the boys say they were "little b**ch[es]," and he would call them "p**sies." *Id.* at 88, 113. He would specifically call CH "a f***ing baby" and "a f***ing girl, tell him he was a f***ing idiot, ask him if he was f***ing stupid." *Id.* at 110, 125. Micalah Martinez, who spent a lot of time with the family, recalled, "[W]hatever name there is, [Reed] called them. He just -- there wasn't a nice word that came out of his mouth towards the boys." *Id.* at 113. Reed would yell at the boys almost daily and would yell at them in front of KR. Reed acknowledged that the boys were afraid when he yelled.

4

Reed's mother, Gall-Scudder, was also particularly harsh to Woodhead and the boys. On one occasion, Gall-Scudder ransacked the house because she believed Woodhead, CH, and C had not properly cleaned. Woodhead, CH, and C then spent the better portion of a day cleaning up the mess Gall-Scudder had made. On a different occasion, Gall-Scudder made CH wash every dish in the house, taking him 5-6 hours, because he had placed a dirty dish in the dishwasher. She also once smeared yogurt on CH's face for the same error and called him a pig. Gall-Scudder spanked both boys with spoons, leaving marks that lasted for a week or more. At trial, one witness stated, "The boys were like slaves to [Gall-Scudder]." *Id.* at 73.

Reed and his mother also often invented punishments for the boys that were meant to publicly shame them. On one occasion, C was forced to wear a dress while walking the dog after the dog had an accident in the house. In a similar incident, when C was 11 or 12, he had to wear a Pull-Up for not cleaning up after the dog. Martinez recalled a similar incident where CH had to put on a Pull-Up and sit at the end of the picnic table, away from the rest of the family. During the incident, Reed would not allow anyone to talk to CH, even though CH seemed scared. When the boys would get their hair just as they liked it, Reed would shave their heads as punishment. This occurred every 4 or 5 months.

Reed was more lenient with KR than CH and C. Burnett, Reed's employer, recalled that with his daughters, Reed was "[c]ompletely opposite. Very caring, very gentle, just very patient with the girls." *Id.* at 125. Burnett also recalled that Reed's behavior toward his previous partner's boys, who were approximately 2, 4, and 7 at the time, was similar to his behavior toward Woodhead's boys. Reed used vulgar language, very strict discipline, and had heightened expectations of them.

5

The trial court heard multiple witnesses testify about Reed isolating and controlling Woodhead. Reed would tell Woodhead "she was a f***ing idiot, tell her to shut the f**k up, called her a whore, would call her a b**ch." *Id.* Burnett recalled that Reed would do this in front of any of their friends and Woodhead "got to the point where she was very quiet and submissive." *Id.* at 126. On one occasion, when Reed had been drinking and rear ended another car, he made Woodhead get into the driver's seat so he would not get another DUI charge.

Woodhead described Reed grabbing her shirt, shoving her up against the wall, and getting in her face. She recalled that Reed had ripped necklaces off her neck, that when she would stand up to walk away he would shove her back down, and that she could not go anywhere without his permission "or until he was done getting in [her] face and yelling at [her]." *Id.* at 149. Woodhead testified that during her relationship with Reed, "I was scared. I felt like I was trapped and I wasn't allowed to go anywhere." *Id.* at 133. If Woodhead needed to go somewhere, she could only take one child with her at a time to prevent her from leaving Reed. In addition, Reed would physically hold her back from leaving by getting in her way or shutting the door. Reed had video surveillance monitoring the farm's gate to see any time anyone came or went from the farm. Reed also went through Woodhead's phone numerous times, either looking through it while she was asleep or out of the room or grabbing it forcibly from her hands.

During their first separation, Reed insinuated that he was going to commit suicide, sending Woodhead texts saying goodbye, "Tell the kids, all of them, I loved . . . them," and finally texting, "Misfire," which Woodhead believed meant he tried to shoot himself but the gun misfired. *Id.* at 154. After Woodhead left the farm in October 2017, Reed sat at KR's school all day, either in the classroom or parking lot. Reed told his employer, Burnett, that he was not available for work until

he received full custody of his daughter because he had to make sure Woodhead was not able to pick KR up from school.

When asked if he had ever physically harmed either of Woodhead's sons or his daughter, Reed said, "[N]ever." *Id.* at 19. When asked about Woodhead, Reed responded, "I have never touched any of them." *Id.*

C.      Recordings of the Incident with CH

      1.      Arguments and decision admitting the recordings

In his direct testimony, Reed acknowledged an incident involving CH, who was 12 at the time, where Reed alleged that CH had been in Reed's bedroom while Reed and Woodhead were out. Reed claimed CH would take money from his room, and Reed did not want CH in the room because he kept a gun and knives inside. Reed claimed the argument was about CH telling the truth and that it did not result in any physical violence. The incident occurred in October 2017, just before Woodhead and the boys left the farm for the last time.

During the incident, Woodhead made several short recordings on her cellphone. Most contain both video and audio, but a couple contain only audio with a black screen. Throughout the recordings, Reed periodically acknowledged and addressed Woodhead. KR, who was four, was also present and can be heard in several of the recordings.

Near the end of the first full day of the one-and-a-half-day trial, after the trial court had heard from all of the witnesses in both parties' cases in chief, Woodhead moved to admit the recordings of the incident. The recordings began with Reed accusing CH of entering Reed's room, which was off limits to the boys, and playing video games when Reed and Woodhead were not home. The incident went on for several minutes as Reed shouted profanities at CH while trying to get CH to admit to the transgression.

Before the recordings were admitted, Reed's counsel asked to question Woodhead. Woodhead testified that her phone was "right out in the open," so Reed would have been aware that she was recording. *Id.* at 157. However, Woodhead admitted she did not expressly inform Reed she was recording, and he did not agree to be recorded. Woodhead's counsel asked Woodhead if Reed was aware that she was recording him. Woodhead responded, "Yeah. I had my phone up, I don't know what else he would have thought." *Id.* at 158. She was also asked whether Reed would have said so if he did not want her to record him, and she replied, "Oh, yeah." *Id.* Woodhead described a prior occasion where she attempted to take pictures, and Reed took her phone and threw it across the room.

Reed's counsel objected to the admission of the recordings based on the Privacy Act in general and RCW 9.73.030[2] in particular, which requires all-party consent to recordings of a private communication or conversation, unless an exception applies. One exception allows recording of a threatening communication with only one party's consent. *See* RCW 9.73.030(2)(b). The trial court took note of the exceptions outlined in the statute and stated that "in this case, clearly there is one party who is consenting." 1 VRP at 162. The trial court then asked Woodhead's counsel to make an offer of proof as to the relevant contents of the videos.

In the offer of proof, Woodhead's counsel explained that Reed was physically intimidating in the videos, getting very close to CH's face, using extreme profanity, and referring to past physical abuse. Woodhead's counsel argued it was reasonable for CH to perceive a threat and "even if it's not bodily harm, it's extreme emotional harm." *Id.*

---

[2] The legislature amended RCW 9.73.030 in 2021, but the amendment did not impact any provisions relevant to this case. *See* SUBSTITUTE H.B. 1223, at 8-9, 67th Leg., Reg. Sess. (Wash. 2021). Therefore, we cite to the current version of the statute.

Woodhead's counsel then argued that RCW 9.73.030(2)(b) exempts threats of bodily harm from the all-party consent requirement, the recordings included implicit threats of bodily harm, and Reed committed domestic violence against CH in the recordings. Woodhead's counsel also argued that Woodhead communicated in a reasonably effective manner that she was recording the conversation, under RCW 9.73.030(3), by showing Reed that she was recording.

Reed's counsel then briefly argued that under *State v. Townsend*, 105 Wn. App. 622, 627, 20 P.3d 1027 (2001), *aff'd*, 147 Wn.2d 666, 57 P.3d 255 (2002), evidence obtained in violation of the Privacy Act is inadmissible for any purpose.[3]

The trial court overruled the objection and admitted the recordings. The trial court explained that the statute did not prevent admission of the recordings. The trial court also stated that Reed had "opened the door to this evidence by testifying about it very specifically" in his direct examination. 1 VRP at 168.

2.  Content of the recordings

The first video starts with Reed standing very close to CH, yelling that he knows the television had been used and swearing repeatedly. Reed threatens, "I'll take your f***ing hair, your earrings, and your phone tonight." Ex. 15, at 1. Reed loudly says, directly in CH's face, "last chance to be a f***ing man and not a b**ch;" "punishment's coming whether you f***ing admit it or not;" "it's up to you to be a man or a b**ch right now;" "you're a f***ing liar [CH], get the f**k out of my face." *Id.* Four-year-old KR can be heard in the background.

---

[3] The transcript reads, "Evidence obtained in violation of the Washington Privacy Act, which bars the recording of transmitted private communication without consent of all parties, as *admissible* for any purpose." 1 VRP at 166-67 (emphasis added). This was likely a slip of the tongue or a scrivener's error. Reed's counsel was arguing that the evidence would be *in*admissible for any purpose.

In the second video, Reed is screaming at CH, standing very close to him, pointing at him, swearing, "All you want to do is continue with your goddamn lies," and "It's your motherf***ing fault." Ex. 15, at 2. CH, who looks afraid, seems to be trying to stand very still.

In the third video, Reed looms over CH and screams directly in CH's face. Reed screams, "Got it? Or you will be put in [an] institution tomorrow. I don't give a f**k . . . Shut the f**k up." Ex. 15, at 3. In the fourth video, Reed continues swearing, asking, "You want to treat me like a punk b**ch?," and telling CH to "act like a man." Ex. 15, at 4. Reed says, "You're spitting in my motherf***ing face." *Id.* Reed asks CH, "Why don't you f***ing be a man?," and then screams directly in CH's face that he already knows CH was in his room. *Id.*

The fifth recording is mostly audio. Near the beginning, Woodhead suggests that CH just say that he did it so he does not get his earrings taken and head shaved. Reed yells, "Do you understand why I'm pissed off right now? I'm pissed off 'cause you're continuing to f***ing lie about it." Ex. 15, at 5. Reed threatens to watch the gate video to see if someone else came through the gate while he was out. Reed sees Woodhead get up and asks her where she is going, then tells CH, "You're gonna cause us to fight." *Id.* Reed says to CH, "I thought you were coming home to learn how to be a man?" *Id.* Reed tells CH, "You're not being a man right now, you're being a b**ch. You're being a big f***ing b**ch." *Id.* When the recording becomes video, Reed is standing very close to CH again. Reed asks, "Are you going to be a man for one f***ing time and take a punishment or are you gonna lose everything? Are you gonna lose everything?" *Id.* He then says, "Your hair, your earrings, and your phone are all gone by Friday." *Id.*

The sixth recording is entirely audio. KR can be heard throughout the recording and, at one point, can be heard crying. Reed tells CH that he is "bringing the a**hole back in me," and to "take your head and remove it from your a** tonight." Ex. 15, at 6. Reed directs CH to clean the kitchen,

sweep, and mop because he did not clean while they were out. Reed says, "You chose to f***ing ignore me" and "this is bullsh*t, and I don't know why you treat me so f***ing bad." *Id.* Then, as he raises his voice, Reed says,

> You're bringing the old me back, you're bringing the old me out. Is that what you want? Because I'm this close to f***ing blowing my stack, and I think neither one of you can say that I haven't changed, but you're pushing me to somewhere you don't want me. '*Cause if the only way I can get your respect is to put my f***ing hands on you, I might have to put my hands on you*.

*Id.* (emphasis added). Reed continues, "*Do you want me to grab ahold of you right now? Then you better start listening to me and treating me with some goddamn respect*." *Id.* (emphasis added).

The seventh recording is mostly audio. Throughout, Reed repeatedly uses obscenities and calls CH a liar, "a f***ing liar." Ex. 15, at 7. Reed tells CH that he is no longer allowed to use his phone, and if he does, "*I will punish you, and I will punish you with my f***ing hands*." *Id.* (emphasis added). Reed tells CH he is "done being nice" because "no matter how much I change, you ain't got to do sh*t, right b**ch?" *Id.* Reed tells CH to "be a f***ing man, grow a set of nuts." *Id.* While calling CH a liar, Reed tells CH to look at his mom and tell her to her face that he did not go in Reed's room, to look her "in the eye and spit on her" because "that's what you're doing [by not telling the truth]." *Id.* CH is heard briefly responding to something with emotion in his voice. *Id.* Reed then says, "I ain't gonna put my hands on you . . . the old me, oh yeah, he would put his hands on you." *Id.*

The eighth recording is entirely audio. Reed is screaming. CH can be heard with emotion in his voice saying he wasn't in the room. Reed asks Woodhead if she believes CH. KR says something, and Reed says, "Get out of here, I'm not doing this in front of her." Ex. 15, at 8. He calls CH a "p**sy" repeatedly, says he does not "give a f**k," and says, "I'm not raising a f***ing p**sy." *Id.* He continues berating CH, and by the end Reed is screaming again: "You want to be a

p**sy? Be a p**sy. You want to be a f***ing man? Be a f***ing man right now and tell me you were in my goddamn room." *Id.* Reed shouts, "Yeah, you've got me pissed off right now, but have I touched ya? Have I touched ya? No, you know why? Because I am different, you ain't." *Id.* Reed then states, "I'm not going to put my f***ing hands on you. I won't. I won't lower myself to that. You keep being a lying piece of s***." *Id.*

Throughout all of the recordings, 12-year-old CH, who is quite a bit smaller than Reed, appears to be trying to stay still, quiet, and nonconfrontational.

After the recordings were published in open court, the trial court issued a temporary order that immediately changed custody of KR to Woodhead. The trial court found that the recordings met the requirements under RCW 26.09.191 of "physical, sexual, or a pattern of emotional abuse of a child," and this "[c]learly meets the definition of [']abuse of a child,['] especially when it is in front of the child who is the subject of this case." 1 VRP at 178.

D.    The Trial Court's Ruling

In an oral ruling, the trial court found that Reed committed emotional and physical abuse of Woodhead and the three children, KR, CH, and C, requiring restrictions under RCW 26.09.191.

The trial court found the third party testimony of Burnett, describing Reed's abusive and controlling behavior, as well as Woodhead's reaction to the behavior, to be credible. The trial court also found Woodhead's testimony to be credible. The trial court found that Woodhead "felt scared, trapped, and was not allowed to go anywhere; which tells [the court] that she was being isolated." 2 VRP at 268. When asked why Woodhead did not confront Reed about a punishment CH received, Woodhead stated that CH's punishment "would have been worse," which underscored "the fact that there is domestic violence in this relationship." *Id.*

The trial court also found Woodhead to be credible when she said Reed made her feel like a child, grabbed her by the shirt and shoved her against the wall, ripped necklaces off her, shoved her down if she tried to leave, yelled, and made it so she was not free to come and go. In contrast, the trial court found Reed's testimony was not credible, "especially . . . where he talks about what he was trying to do in that videotape. He was not trying to discipline a child, he was emotionally and, frankly, physically abusive to [CH] when he was in his face like that." *Id.* at 271.

The trial court found that "the totality of the evidence that was presented in this case is well beyond the preponderance of the evidence . . . [and] convinces me by clear, cogent, and convincing evidence that [RCW 26.09.191] factors exist in this case and that there need to be severe restrictions on [Reed's] time with [KR]." *Id.* at 269. Under RCW 26.09.191, the trial court found physical and emotional abuse of the stepsons and emotional abuse of KR "by virtue of the fact that she was in this household and witnessed this . . . almost every day." *Id.* at 270. In addition, the trial court found that Woodhead proved there was a history of domestic violence in the household.

The trial court entered findings, a final parenting plan ordering that KR live with Woodhead, and an order of child support. In the final parenting plan, the trial court found the following reasons for putting limitations on a parent under RCW 26.09.191:

> Child Abuse - Shain Reed (or someone living in that parent's home) abused or threatened to abuse a child. The abuse was: physical abuse of [CH and C] and repeated emotional abuse of [KR, CH, and C].
>
> Domestic Violence - Shain Reed (or someone living in that parent's home) has a history of domestic violence as defined in RCW 26.50.010(1).
>
> . . . .
>
> Withholding the child - Shain Reed has kept the other parent away from [KR] for a long time, without good reason.

Clerk's Papers at 58-59 (boldface omitted).

The trial court adopted a plan that allowed Reed to increase his contact with KR in four phases, requiring a motion by either party to advance to the next phase. The trial court ordered that Reed be evaluated for domestic violence by a state certified agency and that he comply with treatment as recommended by the evaluation. The trial court also ordered Reed to complete a 12-week parenting course and an anger management course.

Reed appeals, assigning error only to the trial court's decision to admit the recordings and asking this court to remand for a new trial.

ANALYSIS

PRIVACY ACT

Reed argues on appeal that the recordings of the incident with CH were inadmissible because they were made in violation of the Privacy Act. We disagree.

A.     Privacy Act Generally

RCW 9.73.030(1)(b) makes it unlawful for any person to record a private conversation without first obtaining the consent of all parties engaged in the conversation, unless an exception applies. Private conversations recorded in violation of RCW 9.73.030 are inadmissible in any civil or criminal proceeding under RCW 9.73.050. However, conversations "which convey threats of extortion, blackmail, bodily harm, or other unlawful requests or demands . . . may be recorded with the consent of one party to the conversation." RCW 9.73.030(2)(b).

Whether "facts are encompassed by the Privacy Act's protections" is a question of law that we review de novo. *State v. Gearhard*, 13 Wn. App. 2d 554, 561, 465 P.3d 336, *review denied*, 196 Wn.2d 1015 (2020). We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

There is no dispute on appeal that the conversation that Woodhead recorded was private and that the Privacy Act generally applies.

B.      The Threat Exception to RCW 9.73.030's All-Party Consent Rule Applies

1.      The recordings contain threats of bodily harm

Reed argues that the trial court erroneously admitted Woodhead's recordings of the incident with CH. He contends that no exception to the Privacy Act's all-party consent provision applies. He also asserts that even if the recording contained a threat, Woodhead's consent was not sufficient under the exception allowing one-party consent because she was not a party to the conversation. Woodhead contends that the trial court's decision to admit the recordings was not error because the exception in RCW 9.73.030(2)(b) for threats of bodily harm applied and the resulting one-party consent requirement in the statute was satisfied.[4]

The Privacy Act provides that only one party's consent is necessary when the conversation "convey[s] threats of extortion, blackmail, bodily harm, or other unlawful requests or demands." RCW 9.73.030(2)(b). When addressing the threat exception, both the Washington Supreme Court and this court have interpreted "convey" quite broadly.

In *State v. Caliguri*, the Supreme Court considered whether conversations in four recordings where the defendant discussed the logistics of an arson were admissible under the threat exception because the defendant acknowledged that a janitor "'for sure'" would be killed in the fire. 99 Wn.2d 501, 504, 664 P.2d 466 (1983). The defendant argued that the threat exception did not apply because his words did not actually convey a threat. *Id.* at 507. The court reasoned that

---

[4] Woodhead also contends that Reed opened the door to admission of the recordings by discussing the incident in his testimony in his case in chief, but we need not address Woodhead's additional arguments because our analysis under the Privacy Act's one-party consent exception is dispositive.

because the conspiracy and underlying request to help set the fire were ultimately about committing murder, obviously a crime involving great bodily harm, "any conversation 'convey[ing]' the request is squarely within the scope of RCW 9.73.030(2)(b)." *Id.* (alteration in original).

Caliguri further argued that the actual request to set the fire was only conveyed in the second recorded conversation, "while the other conversations focused solely on implementation of the request already made and agreed to," so only the second conversation should have been admitted. *Id.* The Supreme Court disagreed, adopting a broad definition of "convey" as "'to impart or communicate either directly by clear statement or *indirectly by suggestion, implication, gesture, attitude, behavior, or appearance*.'" *Id.* at 507-08 (emphasis added) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 499 (1971)). The court explained that "[p]lanning among coconspirators to implement an earlier request is behavior indirectly reaffirming and detailing the underlying request." *Id.* at 508. The Supreme Court held that the lower court "did not err in admitting all four tapes into evidence with only minor editing." *Id.*

Then, in *State v. Babcock*, 168 Wn. App. 598, 279 P.3d 890 (2012), this court considered recordings made by an undercover agent without the defendant's consent. During the conversation, Babcock said that "'he wanted to have a couple of people killed'" and named two targets. *Id.* at 602. Babcock argued that the recordings should have been suppressed because he did not consent to the recording and no Privacy Act exception applied. *Id.* at 604. Specifically, he argued that he never expressly conveyed a threat of bodily harm. *Id.* at 607.

In *Babcock*, we relied on the broad definition of "convey" as applied in *Caliguri. Id.* at 608. We explained that the *Caliguri* court "broadly construed 'convey' to include all stages of the agreement and planning" to commit a crime involving bodily harm. *Id.* at 609. "[T]he legislature

16

did not intend to limit the threat exclusion to conversations where the defendant expressly states the threat of bodily harm." *Id.* We held the trial court did not err in ruling that the recordings were not protected under the Privacy Act. *Id.*

Thus, the Supreme Court and this court have applied the threat exception in the Privacy Act broadly and have not limited it to expressly stated threats of bodily harm. The controlling question here is whether the recorded conversations conveyed threats of bodily harm under the broad interpretation established in *Caliguri* and *Babcock*.

Here, the trial court heard Reed's yelling, repeated profanity, and name-calling, and the words he used—"punishment's coming whether you f***ing admit it or not;" "'cause if the only way I can get your respect is to put my f***ing hands on you, I might have to put my hands on you;" "do you want me to grab ahold of you right now?;" and "I will punish you, and I will punish you with my f***ing hands." Ex. 15, at 1, 6, 7. The trial court also saw Reed's physical behavior and demeanor in the recordings with video. This included Reed looming over CH, pointing in CH's face, screaming directly in CH's face, and storming around.

The recordings show that Reed expressly communicated threats of bodily harm to CH, and he "'indirectly by suggestion, implication, gesture, attitude, behavior, or appearance'" threatened bodily harm to CH. *See Caliguri*, 99 Wn.2d at 507-08 (quoting WEBSTER'S 499). Anyone reviewing the recordings would see that Reed's statements and actions were threatening bodily harm to a 12-year-old child who was doing his best to stay calm and avoid escalation. Reed's statements near the end of the recordings claiming that he would not physically harm CH after all are not enough to outweigh the express threats, as well as the clear implication throughout the rest of the recordings that Reed would physically harm CH if he did not confess to entering Reed's room.

Reed is correct that information obtained in violation of the Privacy Act is inadmissible in any civil or criminal proceeding. RCW 9.73.050. However, there is no Privacy Act violation if an exception applies. In its oral ruling, the trial court appropriately found that in the recordings, Reed "was emotionally and, frankly, physically abusive to [CH] when he was in [CH's] face like that," and Reed threatened CH with physical harm. 2 VRP at 271. Therefore, the recordings were admissible with a single party's consent under the Privacy Act's threat exception. *See* RCW 9.73.030(2)(b).

2.  Woodhead was a party to the conversation

Reed argues that even if an exception to RCW 9.73.030 applies, Woodhead was not a party to the private conversation and, therefore, she could not provide the required one-party consent. We disagree.

As an initial matter, Reed is incorrect that notice of recording was required. Woodhead would only be required to announce that she was recording if all-party consent were required under the Privacy Act. RCW 9.73.030(3) provides, "Where consent *by all parties* is needed pursuant to this chapter, consent shall be considered obtained whenever one party has announced to all other parties engaged in the communication or conversation, in any reasonably effective manner, that such communication or conversation is about to be recorded or transmitted." (Emphasis added.) Because the exception in RCW 9.73.030(2)(b) applies, only one party to the conversation needed to consent.

During its oral discussion on the record about the admissibility of the recordings, the trial court found that Woodhead was a party to the conversation. The record supports the trial court's finding. Reed speaks directly to Woodhead in several of the recordings, at one point asking her where she is going and at another asking if Woodhead believes CH. In several of the videos, Reed

looks directly at Woodhead or points to her. Reed tells CH to look his mother in the eye. In one recording, Woodhead speaks to CH, encouraging him to say he was in Reed's room to lessen his punishment, indicating that she has been part of the entire conversation. Woodhead was a party to the conversation, and her act of recording the incident is evidence of her consent.

Reed makes several broad arguments about the policy implications of allowing such recordings to be admitted in family law proceedings. But the legislature has not carved out any special treatment for family law cases under the Privacy Act. All threats of bodily harm are treated the same under the Act. We note, however, that application of the one-party consent exception under RCW 9.73.030(2)(b) is limited to instances when there are threats of bodily harm or other unlawful requests or demands. Our analysis should not incentivize recording of conversations that do not include such threats.[5]

In sum, we conclude that Woodhead was a party to the recorded conversation where the threats were made and, therefore, the one-party consent requirement was satisfied.

## CONCLUSION

The trial court did not abuse its discretion when it admitted the recordings in this case. We affirm.

---

[5] Although Reed seems to imply that his treatment of CH, a boy, was not relevant to his ability to parent KR, a girl, perhaps implying that the recordings were not relevant in addressing the parenting plan for KR, the assignments of error are based only on the Privacy Act and not on any evidence rule. In addition, in its oral ruling, the trial court specifically found emotional abuse of KR because "she was in this household and witnessed this . . . almost every day." 2 VRP at 271; *see also Rodriguez v. Zavala*, 188 Wn.2d 586, 596-98, 398 P.3d 1071 (2017) (holding exposure to domestic violence against other family members is harmful for children and constitutes domestic violence under the Domestic Violence Protection Act, chapter 26.50 RCW).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, ACJ_
Glasgow, J.

We concur:

_, C.J._
Lee, C.J.

_Worswick J_
Worswick, J.